Robert INGENITO and James F. Cear,
Plaintiffs,

v.

BERMEC CORPORATION et al.,
Defendants.

Edward O'SHEA et al., Plaintiffs,

v.

STATE MUTUAL LIFE ASSURANCE
COMPANY OF AMERICA et al.,
Defendants.

Morton BICKART et al., Plaintiffs,

v.

BERMEC CORPORATION et al.,
Defendants.

Nos. 70 Civ. 4077, 70 Civ. 5306 and
70 Civ. 5644.

United States District Court,
S. D. New York.

May 8, 1974.

Powers & Gross, New York City, for plaintiffs.

Wachtell, Lipton, Rosen & Katz, New York City, for State Mutual Life Assurance Co. of America, Richard H. Wilson and C. John McCloughan, Jr.

Rubin, Wachtel, Baum & Levin, New York City, for Bermec Corp., Herman L. Meckler, Herbert R. Degnan and William C. Ragals, Jr.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Collateral Factors Corp. and Benjamin Cohen.

Baar, Bennett & Fullen, New York City, for Budget Financial Corp.

White & Case, New York City, for Civic Southern Factors Corp.

Natanson & Reich, New York City, for West End Livestock, Inc.

Garey & Garey, New York City, for Jack Dick.

Albert E. Martin, New York City, for William Gladstone.

Hoffberg, Margolies & Ginsberg, New York City, for Herbert Prentice, Robert Segal and Sheldon Bendit.

Glass & Greenberg, New York City, for Victor Puig.

Schwartz, Mermelstein, Burns, Lesser & Jacoby, New York City, for Trustee for Black Watch Farms, Inc. and Black Watch Herds Corp.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for Trustee for Bermec Corp.

Dunnington, Bartholow & Miller, New York City, for Arthur Andersen & Co.

Amend and Amend, New York City, for Empire National Bank.

## MEMORANDUM

LASKER, District Judge.

These three actions arise out of the activities of Defendant Black Watch Farms, Inc. ("Black Watch") which was between 1963 and 1970 in the business of selling Aberdeen Angus breeding cattle and maintaining the animals for the accounts of the purchasers. The purchasers were primarily well-to-do professional and business people who seem to have bought the cattle not out of any particular yearning for the wild west, but as tax shelters. The hoped-for advantages never materialized since Black Watch ran into financial difficulties and allegedly defaulted on its maintenance agreements covering the cattle, resulting in substantial losses for many investors. Black Watch filed in bankruptcy in September, 1970, and these lawsuits followed.

Plaintiffs in *O'Shea* (the pre-prospectus action) are herdowners who purchased their cattle prior to the time (in May 1969) Black Watch effected a registration statement under the Securities Act of 1933. Plaintiffs in *Bickart* and *Ingenito* (the post-prospectus actions)

bought their herds pursuant to a prospectus dated May 26, 1969.[1] Defendants, in addition to Black Watch itself,[2] are a varied group including Black Watch's shareholders, officers and directors, some of its salesmen, its accountants, most of its lenders, and Bermec Corp. and State Mutual Life Assurance Co. of America ("State Mutual") alleged controlling persons of Black Watch.

The extensive and somewhat diffuse complaints allege violations of the securities laws (§§ 5, 12 and 17(a) of the Securities Act, 15 U.S.C. §§ 77e, 77*l* and 77q and § 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b)) as well as common law fraud and usury. Before us are parallel motions by the pre-prospectus plaintiffs and the post-prospectus plaintiffs for an order consolidating the three cases and for a determination pursuant to Rule 23, Federal Rules of Civil Procedure that the entire lawsuit proceed as a class action with two subclasses (pre- and post-prospectus purchasers). Also before us is a motion by defendants State Mutual, Richard H. Wilson and C. John McLoughan, Jr. (officers of State Mutual as well as directors of Black Watch) and West End Livestock, Inc., ("West End") to dismiss the complaints as against them. We refer to all plaintiffs as a group unless otherwise specified.

### A. *The Class Action Motion.*

#### I.

The named plaintiffs entered into agreements with Black Watch during the period 1967–68[3] by which each herdowner purchased a herd of cattle from Black Watch, receiving certificates of title covering each animal, and entered into a maintenance contract under which

---

1. The papers submitted on this motion are unclear on whether the prospectus was first issued in March, 1969 or May, 1969. However, none of the issues presented turn on the precise date.

2. In order to avoid a stay of the present lawsuit pending completion of the bankruptcy proceedings, the Black Watch Trustee in

Bankruptcy has entered into a stipulation with counsel for plaintiffs which allows the Trustee to relitigate any issues decided adversely to Black Watch.

3. Purchases by members of the proposed class, however, span the period 1963 to 1969.

Black Watch was to provide complete care for the herdowner's animals. In addition, almost all plaintiffs financed the purchase price for the animals by a cash down payment and a set of promissory notes payable to Black Watch, generally over a three year period. In the period before mid-1968, when defendant Bermec acquired control of Black Watch, the basic selling unit was a herd of ten female animals for $35,000; after mid-1968, a herd consisted of 36 female animals and a ⅓ interest in a breeding bull for $100,000. Maintenance fees were $500. per animal per year for a ten animal herd, and $350. per animal per year for a 36 animal herd. There were, evidently, certain minor variations in the terms of the contracts between herdowners and Black Watch, the relevance of which will appear later in the discussion. Black Watch pledged most of the herdowner notes given in payment for the cattle to several lending institutions; the principal noteholders have been named as defendants in these actions, and plaintiffs seek, among other things, a mandatory injunction to prevent enforcement of the notes by the holders.

Black Watch, which began selling herds in 1963, took the position until 1968 that its transactions with herdowners (consisting of a purchase contract, maintenance contract and note) did not constitute securities within the meaning of the Securities Act and did not register its contracts with the SEC until March 20, 1969, the date of the first prospectus. After Bermec acquired control in mid-1968, counsel for both Bermec and Black Watch sought a no-action letter from the SEC; the SEC advised that the sale of cattle together with a maintenance contract constituted a security in the nature of an investment contract, which would require registration. Black Watch then suspended its selling program until a registration became effective. The *Bickart* plaintiffs purchased their herds pursuant to the prospectus and issued notes in full or part payment for their herds; the *Ingenito* plaintiffs paid entirely by cash.

Otherwise, the "package" of transactions entered into by plaintiffs in all three actions appears to have been substantially identical.

## II.

The parties have extensively briefed, and orally argued before the court, the question whether plaintiffs have satisfied the several prerequisites to the grant of class action status specified in Rule 23. However, merely reading the complaints and surveying the roll of defendants indicates that plaintiffs' most difficult hurdle is to meet the requirement of Rule 23(b)(3) that questions of law or fact common to the class predominate over individual questions and that a class action is the superior method for adjudication of the disputes between the parties.

The *O'Shea* plaintiffs allege that all members of the proposed class of pre-prospectus purchasers had the right to rescind their contracts because (a) Black Watch's sales constituted sales of unregistered securities, in violation of § 12(1) of the Securities Act, 15 U.S.C. § 77l(1); and (b) the Black Watch defendants and control persons, in connection with the sales, allegedly employed both oral and written misleading representations or omissions of material facts, in violation of § 12(2) and § 17(a) of the Securities Act, 15 U.S.C. § 77l(2), and 77q(a); and § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b). Plaintiffs number among the claimed misrepresentations and omissions the true value of the herds, future selling prices of the cattle, expected progeny rates; and the facts that the animals would be scattered over many different farms, that there was no present market for the securities, and that there was a risk of near-total loss if Black Watch failed to honor its maintenance obligations.

The *O'Shea* plaintiffs further allege that the Black Watch defendants took certain actions from January 3, 1969 (when the SEC refused a no-action letter) to September 4, 1970 (when Black

Watch filed in bankruptcy) to conceal from plaintiffs, and deprive them of their alleged right to rescind their transactions. They assert that Black Watch was already in serious financial trouble by mid-1969 and in danger of defaulting on its herd maintenance obligations. The Black Watch defendants allegedly failed to inform herdowners of the SEC's advice to register any new offerings and of the material in the May 26, 1969 prospectus (which evidently was not mailed to the pre-prospectus herdowners) stating that prior investors had a right to demand rescission, and that Black Watch might be forced into liquidation because of severely decreased cash flow.

Additionally, the Black Watch defendants are claimed to have engaged, during the twenty month period spanning the issuance of the prospectus and the filing in bankruptcy, in a course of conduct intended to forestall the complaints of herdowners and to keep them paying on their contracts. Among the acts and devices complained of are an alleged "buy-out" proposal, offered to some unhappy herdowners by which they could pay a substantial sum to Black Watch in return for a release on their notes; the offer of new notes containing extended payment terms and release and waiver provisions in exchange for the original notes; and reduced maintenance charges or other modifications of the existing contracts. In short, the *O'Shea* plaintiffs claim the Black Watch defendants carried out an orderly program to assuage the doubts and complaints of unhappy herdowners and conceal from them their alleged right to rescind.

■ The *O'Shea* plaintiffs' claims against the noteholder defendants (including State Mutual, which is also charged as a control person of Black Watch) cast them as co-conspirators or aiders and abettors of the alleged fraud by the Black Watch defendants. The noteholder defendants, who acquired herdowner notes beginning in 1968, were at the time of their acquisition allegedly aware of fraud in Black Watch's sales practices, its deteriorating financial condition and the possibility of wholesale demands for rescission. They are claimed to have conspired with the Black Watch defendants to conceal from herdowners the precarious condition of Black Watch, and to keep them paying on their notes. The purpose of the scheme, as plaintiffs characterize it, was to bolster Black Watch's precarious cash position and, since herdowner notes were allegedly Black Watch's principal asset, to protect the noteholders' own interest in keeping Black Watch afloat. In addition to the § 10(b) antifraud claims, the *O'Shea* plaintiffs contend that many, if not all of the herdowner notes are usurious. Proof of any of these assertions would, of course, puncture the noteholders' status as holders in due course.

Plaintiffs in *Bickart* and *Ingenito* purchased their herds pursuant to a prospectus dated May 26, 1969. They charge fraud by the Black Watch defendants in the use of an allegedly false prospectus, failure to update the prospectus to disclose subsequent material events, (chiefly Black Watch's declining financial condition) and extensive oral and written misrepresentations and projections (similar to those charged in *O'Shea*) by Black Watch salesmen made independent of the prospectus. Like the *O'Shea* plaintiffs, the *Bickart* plaintiffs further assert that the noteholders defendants joined with the Black Watch defendants beginning in mid-1969 to lull herdowners into retaining their securities and paying on their notes while failing to disclose (as plaintiffs claim) that Black Watch was being operated chiefly for the benefit of its creditors. The devices allegedly used to lull the *Bickart* plaintiffs are the same as those in *O'Shea*.

The *Ingenito* plaintiffs paid cash for their herds and as a result they sue only the Black Watch defendants and Bermec and State Mutual (alleged control persons) on grounds similar to those already described.

The pre-prospectus (*O'Shea*) subclass is defined as "those purchasers of Black

Watch securities prior to May 26, 1969, who (i) had the right to rescind their purchases, and (ii) were induced by the fraudulent conduct of the defendants to take no action or accept a new security[4] in lieu of exercising their right to rescind." The post-prospectus class (*Bickart* and *Ingenito*) is defined as all persons "who purchased investment contracts of Black Watch pursuant to the Prospectus dated May 26, 1969. . . ."

### III.

Plaintiffs contend that the state of facts described (which we take as true for purposes of this motion) presents the following questions of law or fact common to the class: (1) whether the bundle of obligations binding Black Watch and herdowners was a security required to be registered under the Securities Act of 1933, and if so, whether the pre-prospectus purchasers' right of rescission (provided by § 11) for violation of § 12 of the Act was time-barred when the *O'Shea* action was commenced; (2) whether a projection sheet (which the parties agree was generally, if not always, used as part of the Black Watch sales presentation) misrepresented anticipated herdowner profits, progeny rates and sales prices for cattle, in violation of § 10(b); (3) whether the Black Watch defendants omitted to disclose in connection with the underlying sales transactions certain material information relating to Black Watch's operating procedures and financial condition; (4) whether the prospectus issued in 1969 was false and misleading, and should have been updated; (5) whether fraud was practiced on the herdowners by "lulling" them into retaining their investments by means of the various contractual modifications detailed above; (6) whether the noteholder defendants aided and abetted the alleged fraud by holding themselves out as holders in due course and withholding from herdowners certain information about Black Watch's precarious financial position.

Plaintiffs' papers specify several other questions claimed to be common to all of them, but those just described are the principal ones. We conclude, for the reasons set forth below, that these are not common issues even as to members of the proposed subclasses (pre- and post-prospectus herdowners, respectively) and consequently that common issues do not predominate over individual issues as required under Rule 23(b)(3).

The first issue (the *O'Shea* plaintiffs claims under § 5 and § 12 of the 1933 Act) is not seriously pressed on this motion. Defendants insist, and plaintiffs do not seriously dispute (apart from advancing a curiously arcane tolling theory) that the § 12 claims of most (if not all) the *O'Shea* plaintiffs are time-barred by the relatively short limitations periods imposed by § 13 of the 1933 Act, 15 U.S.C. § 77m. However, we need not decide whether the § 12 claims are time-barred since plaintiffs have failed affirmatively to plead compliance with the statute of limitations, as they are required to do. Newberg v. American Dryer Corp., 195 F. Supp. 345 (E.D.Pa.1961); Premier Industries, Inc. v. Delaware Valley Financial Corp., 185 F.Supp. 694 (E.D.Pa. 1960); cf. Fischman v. Raytheon Mfg. Co., 9 F.R.D. 707 (S.D.N.Y.1949), rev'd on other grounds, 188 F.2d 783 (2d Cir. 1951).

Moreover, even assuming some plaintiffs could plead compliance with the statute of limitations, the § 12 claims may well be unamenable to class treatment: The *O'Shea* named plaintiffs bought their herds on an individual basis, not pursuant to a general public offering, but over the period from 1967 to 1969. Members of the *O'Shea* class purchased beginning in 1963. Since it is

---

4. Plaintiffs take the position that the various modifications of their investment contracts with Black Watch constitute the sale of "new securities" for purposes of the pur-

chaser-seller requirement of Birnbaum v. Newport Steel, Inc., 193 F.2d 461 (2d Cir. 1952).

undisputed that many herdowner contracts were back-dated (which evidently resulted in extra interest charges to Black Watch and extra depreciation deductions for some herdowners), simply determining when the statute of limitations in fact began to run on the § 12 claims would involve a separate inquiry as to each herdowner. Finally, even assuming a number of plaintiffs' proposed class to have timely sued, nothing in the present record suggests that they are numerous enough to warrant class status.

## IV.

■■ Plaintiffs' second purportedly common issue, and the one pressed most vigorously, concerns the use of an allegedly misleading projection sheet given or displayed to each sales prospect (both pre- and post-prospectus) as part of the Black Watch salesman's oral presentation. The sheets were a printed or handwritten form with spaces for projected average sales values of the animals, cash flow, five and ten-year yield in tax savings, and anticipated progeny rates of calves. Black Watch salesmen appear to have filled in the spaces on sheets according to the particular financial situation of the sales prospect and their own sales practices, in order to illustrate to a prospective herdowner how he might benefit from investing in Black Watch. It is undisputed that while the projection *forms* were identical (or nearly so), the particular figures supplied varied from prospect to prospect. (Katz Affidavit, pp. 94–5). Plaintiffs argue, nonetheless, that the allegedly uniform use of a common sales *technique,* such as the projection sheets, presents the common issue whether Black Watch salesmen were guilty of fraudulent misrepresentations in violation of § 10(b). Such a contention misses the point, since it is not the use of any particular *technique* that offends § 10(b) but the use of a knowing, material *misrepresentation* to the detriment of investors. On a Rule 23(b)(3) class action motion, the commonality of these

misrepresentations, rather than the technique, is the critical issue.

It is clear that the projection sheets did not contain common and uniform representations. Even as to the named plaintiffs, the sales were made over a period of two years; since cattle prices fluctuated during this period (as plaintiffs' own papers acknowledge) the accuracy of any particular projection of cash flow cattle prices and other investor benefits depends upon, of course, the prevailing market price at the time the projection was made. For other class members, who purchased herds over a six-year period (1963–69) the disparities are likely to be even greater. Such circumstances, where claimed affirmative misrepresentations are made over a long period of time, have been recognized as inappropriate for class treatment. Pearson v. Ecological Science Corp., 1973 CCH Fed.Sec.L.Rep. ¶ 94,030 (S.D. Fla.1973). Moreover, it clearly appears on the record before us that herd owners were in fact shown projection figures which varied substantially even as to the named plaintiffs alone. The affidavit of George A. Katz, in opposition, cites depositions of various plaintiffs which establish that salesmen's projections of cattle prices varied from a low of $1,000. per animal to a high of $3,200. These projections were made by twelve different salesmen in connection with sales presentations which resulted in purchases between September 1967 (plaintiff Lazarus) and February 1969 (plaintiff Bonat). (Katz Affidavit, ¶¶ 172–174.) Similarly, depositions of plaintiffs disclose that projected progeny rates varied from 85% to 100%. (Katz Affidavit, ¶ 175.)

■ In our view, however, the greatest difficulty in treating the projection sheets as a common issue is that projection sheets were not the only, or even the major vehicle for selling the Black Watch program. As plaintiffs' supporting affidavits make clear, (and indeed, as the complaints claim on their face) a Black Watch salesman made his sales presentation in person. Consequently,

not only the various figures embodied in the projection sheet, but also their context and significance would present individual issues of fact: the projection sheets were not self-explanatory. For example, the Katz affidavit cites deposition testimony of several plaintiffs, some of whose progeny projections were allegedly orally touted as "guarantees", while the projections given others were simply representations of opinion. (Katz Affidavit ¶ 175.)

The authorities which plaintiffs claim support class treatment on the projection sheet issue are not persuasive, since they deal with printed, uniform circulars distributed to the class, without the additional element of oral representations. *See* Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962); Derdiarian v. Futterman Corp., 38 F.R.D. 178 (S.D.N.Y.1965); S. E. C. v. Los Angeles Trust Deed & Mortgage Exchange, 186 F.Supp. 830 (S.D.Cal.1960). We conclude that use of the projection sheet does not present a common issue.

## V.

Similar problems exist in connection with plaintiffs' third proposed common issue (which relates only to the pre-prospectus subclass), allegedly uniform omissions to disclose at the time of sale certain material information relating to Black Watch's method of operations and finances. In the ordinary § 10(b) class suit based on material omissions, the finder of fact is faced with the relatively straight-forward problem whether the prospectus, or other written material, does in fact fairly represent the facts claimed to be omitted and if not, whether the omitted facts are material. In such a case, reliance (in effect, constructive reliance) is inferred from the finding of materiality itself. Affiliated Ute Citizens v. United States, 406 U.S. 128, 150–154, 92 S.Ct. 1456, 31 L. Ed.2d 741 (1972).

However, such an inference is supportable for purposes of a class action determination only when contact with a prospectus or some other discrete source of information is the only (or at least primary) contact the investor has with the defendant. Such is not the case presented. It is reasonable to expect, since the Black Watch contracts were sold without a prospectus at arms length, that omissions of material facts will have to be separately established at trial for each *O'Shea* plaintiff. The proof of omission as to plaintiff A, who dealt with salesman X is not proof of material omissions as to plaintiff B who dealt with salesman Y. However, we need not be content merely to infer variations in the claimed omissions. In fact, the Katz affidavit establishes (and is not controverted by plaintiffs) that there were substantial variations among the named plaintiffs as to the alleged omissions detailed in the *O'Shea* complaint (at ¶ 9). On deposition, for example, some plaintiffs stated they were told that their cattle would be centralized at one location, while others were told they would be scattered among several sites—an allegedly undisclosed factor of risk charged in Paragraph 9(e) of the *O'Shea* complaint. (See Katz Affidavit, ¶ 177.) There was also conflicting testimony relating to the allegedly undisclosed fact that Black Watch contracted for maintenance with third parties (Complaint, ¶ 9(d)) rather than leasing or owning maintenance facilities. (See Katz Affidavit, ¶ 178.) It is precisely because of the difficulties thus presented that the view that oral misrepresentations and omissions are not suited for class treatment finds strong support in the authorities. Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973); Morris v. Burchard, 51 F.R.D. 530 (S.D.N. Y.1971); Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y.1968); Goldstein v. Regal Crest, Inc., 59 F.R.D. 396 (E.D. Pa.1973), Comment, The Impact of Class Actions on Rule 10b–5, 38 U.Chi.Law Review 337, 342 (1971).

Plaintiff cites several decisions in which class action status was granted, notwithstanding individual variations in

representations to investors, on the basis of a "common and allegedly fraudulent course of conduct," but the cases are distinguishable. In Grad v. Memorex, 61 F.R.D. 88 (N.D.Cal.1973) several suits charging an issuer with misleading statements in earnings reports and press releases over a period of a year were consolidated for class treatment. The court held that, although there were variations among the several quarterly reports and releases involved, the allegation of a deceptive accounting method for reporting sales and net income was common to all of them. That case clearly differs from the one presented here, since *Memorex* involved only written representations in a few documents covering the same subject (earnings figures), rather than *both* written and oral representations raising the possibility of as many individual issues as there are herdowners.

Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), another key authority cited by plaintiffs, reached the same result as *Memorex, supra,* on similar facts (a series of prospectuses) and for the same reason, does not support plaintiffs' position. In Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909 (9th Cir. 1964) (facts reported at 186 F.Supp. 830 (S.D.Cal.1960)) class action treatment was granted for investors in a "secured 10% earnings program" which involved the purchase of discounted trust deeds or mortgages. Although investors were treated to a barrage of advertising and brochures about the program, no oral representations were made to them, so that proof of the alleged misstatements and omissions presented issues common to the class. See also, Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966).

In Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), which contains perhaps the most liberal construction of Rule 23(b)(3) in the context of a § 10(b) claim, defendants orally solicited plaintiffs' purchase of certain stock. In the course of the year following the purchase, the only communications sent to plaintiffs were several notices relating to shareholders' meetings and a finan-cial statement. Plaintiffs charged that both the oral and written communications omitted certain material facts, in violation of § 10(b). On these facts, the trial court *denied* class action status; the Court of Appeals reversed *after* the trial at which defendants *admitted* non-disclosure of the omissions initially charged. Even so, the reviewing court found the § 10(b) class certification "an extremely close question," 402 F.2d at 99, after finding that the essence of the proposed class claim was *not* (as here) the issue of affirmative misrepresentation, but its converse: a "complete failure to disclose any material facts— which default was necessarily common to all shareholders." 402 F.2d at 99–100. Though plaintiffs here charge important omissions, it is clear both from their pleadings and papers in support of this motion that affirmative misrepresentations (at least as to the Black Watch defendants) are an essential part of their claims. The claims of omissions cannot be said to predominate as required by Rule 23(b)(3).

## VI.

Plaintiffs' final argument relating to Black Watch's alleged common course of conduct (including both affirmative misrepresentations and omissions) essentially concedes that there were variations in the sales pitch given to herdowners. They claim however, that since (for example) *all* the projection sheets were grossly misleading, that the only variations among them relate to the "magnitude of the lie" rather than the question whether there was a "lie" in the first place.

According to plaintiffs' relatively new-fangled argument, since proof of reliance is not a prerequisite to class action status, see, e. g., Dorfman v. First Boston Corp., 62 F.Supp. 466 (E.D.Pa. 1973); Kronenberg v. Hotel Governor Clinton, 41 F.R.D. 42 (S.D.N.Y.1966) or even to ultimate liability, Affiliated Ute Citizens v. United States, *supra,* the fact of somewhat varying representations made to herdowners (which they claim

goes only to the reliance issue) is irrelevant to the predominant (as plaintiffs see it) common issue whether Black Watch engaged in a course of conduct by which it consistently misrepresented resale prices and progeny rates.

The argument misses the mark. Although plaintiffs do not have to allege or establish *reliance* in order to succeed on this motion, it must appear, as a condition to class status, that any misrepresentations or omissions were common to the class. Similarly, they will have to prove at trial not that they *relied* on the misrepresentations, if any, but that any misrepresentations were *material*. The requirement of such proof poses two stumbling blocks to class action status.

Quite apart from the fact that the sales were made over a period of time, while cattle prices (and consequently the accuracy of any projections) fluctuated, the precise quality of the representations—which might range from a solid guarantee or representation of fact to a carefully hedged, highly contingent opinion—would have to be separately proven at trial as to each plaintiff to establish liability. Moreover, as plaintiffs concede, many of them were evidently *shown* projection sheets, which salesmen then took with them. Consequently this "class issue" would in a practical sense be based entirely on alleged individual, *oral* misrepresentations or omissions: Establishing the precise delineation of the alleged projections presented to each plaintiff would create an unmanageable trial. Because the Black Watch defendants do not, of course, admit the substantial commonality and materiality of the alleged misrepresentations at this stage in the proceedings, we must conclude that plaintiffs "course of conduct rationale" does not present issues common to the class.

### VII.

Plaintiffs' fourth purported common issue, which applies only to plaintiffs in *Bickart* and *Ingenito* involves the allegedly false and misleading prospectus distributed to the post-prospectus subclass, and the alleged failure of the Black Watch defendants to update it to reflect material changes in Black Watch's condition. We find that this issue is common to the post-prospectus class, assuming that the other requirements of Rule 23 are met, a question we reach below. Although the post-prospectus plaintiffs acknowledge (and indeed assert as an index of their kinship with the pre-prospectus plaintiffs) that they purchased herds pursuant to the same type of sales presentation as the pre-prospectus plaintiffs, this fact does not, as defendants urge, dilute or destroy the commonality of the prospectus issue in their case. Since, as we have noted, reliance on the prospectus need not be proven at trial, it is immaterial whether other, possibly non-misleading, representations were made to the post-prospectus herdowners in the course of the sales presentation. Proof that the prospectus was materially misleading, and that defendants acted with the requisite scienter, Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2d Cir. 1971), is enough to establish liability, even if plaintiffs bought solely on a tip from the man in the moon. *Affiliated Ute Citizens, supra*, 406 U.S. at 153–154.

### VIII.

Plaintiffs' fifth and sixth proposed common questions applicable to both pre- and post-prospectus purchasers, make claims of securities law fraud (§ 10(b)) and common law fraud by both Black Watch and the noteholder defendants committed subsequent to the various underlying sales transactions between Black Watch and the herdowners. In essence, they claim that Black Watch and the noteholders conspired to mislead and defraud herdowners (1) by "lulling" them into retaining their investments by means of various modifications of the underlying investment contracts obstensibly favorable to herdowners and (2) that the noteholders failed to state material facts, of which they had knowledge, relating to the alleged right of rescis-

sion of the pre-prospectus purchasers and Black Watch's financial condition. Plaintiffs also attack the holder in due course status of the noteholders on the pendent jurisdictional ground that the notes are usurious, and consequently (as they claim) unenforceable.

To state a claim under § 10(b) for fraud committed subsequent to the underlying sales transactions, plaintiff must, of course, come within the class intended to be protected by the statute. It has long been settled that claims under § 10(b) must be "in connection with" a purchase or sale of securities, Birnbaum v. Newport Steel, 193 F.2d 461 (2d Cir. 1952), rather than their mere holding or retention. Plaintiffs claim that they satisfy the requirement of *Birnbaum* and its progeny because (as they say) the alleged modifications, such as the exchange of notes for new notes, (which included estoppel and waiver provisions) reductions in maintenance charges, or the giving of additional cattle at no charge constituted the "sale" or issuance of new securities.

Putting aside plaintiffs' somewhat complicated and novel § 10(b) theory, it is clear that plaintiffs' theory of post-transaction fraud, even assuming its legal sufficiency, does not present common issues for purposes of a Rule 23 motion. Plaintiffs do not allege that the modifications which are, in effect, the prerequisite to jurisdictional standing on a § 10(b) claim, were common to the class. Their papers in support of the motion acknowledge that a *variety* of devices or concessions were used, on an *individual* basis, when herdowners complained or threatened to stop paying on their notes. The Katz affidavit, in opposition, extensively cites deposition testimony of the named plaintiffs establishing that even as to a given type of modification arrangement, the particular provisions differed from herdowner to herdowner. (See Katz Affidavit, ¶¶ 206–213.) Consequently, the particulars of the various post-transaction modifications would have to be separately prov-

en, on an individual herdowner basis, to establish standing to sue under § 10(b). Finally, and perhaps most important, it is not alleged that all class members in fact entered into modification arrangements of whatever type; indeed, it appears many, if not most, did not. Under the circumstances we conclude that plaintiffs' post-transaction § 10(b) claims do not present common issues.

Turning to plaintiffs' pendent claims of common law fraud and usury, we find that they too are unsuited for class treatment. It is immediately apparent that the pendent claims against the noteholder defendants are not amenable to class treatment simply because there are no substantial federal claims, certifiable for class treatment, to which pendent jurisdiction can attach. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, even assuming the post-transaction § 10(b) claims to be suitable for class treatment, the pendent claims still are not. The alleged common law fraud evidently occurred in several states, requiring application of the law of several states. The same is true of the usury claims, (which, according to the complaint, apply only to "many," not *"all"* herdowners), since the herdowner notes were made in different states. Finally, because the usury claims (which may well turn out to be plaintiffs' primary claim) hinge entirely on the alleged back-dating of the underlying contracts, separate factual determinations of the *actual* date of the transaction would be required as to each noteholder, rendering these claims unamenable to class treatment for this additional reason.

Plaintiffs run aground on the same shoals with regard to their pendent claims against the Black Watch defendants who also are charged with common law fraud and usury. Consequently, although, as we have found earlier, the § 10(b) claim of the post-pospectus purchasers against the Black Watch defendants (including Black Watch's control persons) presents a common issue, we find it does *not* meet the requirements

of Rule 23(b)(3) that the common issues *predominate* over individual issues.

■ Our finding with regard to the Black Watch defendants is fortified by the fact that plaintiffs' counsel and the trustee in bankruptcy of Black Watch have entered into a stipulation whereby the trustee will be free to relitigate the issue of Black Watch's liability, if any, following the conclusion of the present litigation, in order to avoid any order staying these lawsuits pending completion of the bankruptcy proceedings. Consequently, permitting a class action against the Black Watch defendants on the issue of the allegedly misleading 1969 prospectus may well prove to be a wasteful and fruitless (in terms of finality) dress rehearsal for subsequent class suits against the trustee. In these circumstances, we find that a class action would not be consistent with the goal of judicial economy embodied in Rule 23, and fails the requirement of 23(b)(3) that a class action is the superior method for efficient adjudication of the controversy.

## IX.

■ For the reasons already described, we also find that these lawsuits should not be consolidated. Our conclusions as to both motions are supported by certain other factors, which for the sake of convenience we treat under the rubric of Rule 23.

■ First, events since Black Watch's insolvency in 1970 have made clear that consolidation or a class action certification at this time might serve only to create a procedural morass. Since 1970, over 200 disputes between noteholders and herdowners have been settled (of a total class, both pre- and post-prospectus, of about 600). Defendant Civic Southern Factors, for example, acquired seventeen sets of herdowner notes; of these, fourteen herdowners have already settled their disputes. Defendant Collateral Factors held 127 herdowner notes; Collateral has (as of the time the motion was filed) either settled

with or obtained judgments against 91 of the herdowners; another nine herdowners have neither sued nor been sued; while twenty-seven cases are still in active litigation. The fact that many members of a proposed class have settled their disputes has been recognized as a significant factor in determining whether a class action is the superior method for adjudicating the controversy. See Berley v. Dreyfus & Co., 43 F.R.D. 397 (S.D.N.Y.1967); Wm. Goldman Theatres, Inc. v. Paramount Film Dist. Corp., 49 F.R.D. 35 (E.D.Pa.1969); Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc., 455 F.2d 770, 775 (2d Cir. 1972).

■ Moreover, we are not here presented with a "death knell" situation in which individual claims are too small to be prosecuted and the only way to effectuate class rights is through the class action device. See Eisen v. Carlisle & Jacquelin, 370 F.2d 119, 120–121 (2d Cir. 1966); Green v. Wolf Corp., 406 F.2d 291, 295 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). Average damages to class members are approximately $80,000.–$100,000., manifestly a sum substantial enough to make individual litigation feasible. Caceres v. International Air Transport Assoc., 46 F.R.D. 89 (S.D.N.Y.1969); Abercrombie v. Lum's Inc., 345 F.Supp. 387, 394 (S.D.Fla.1972).

■ Finally, problems arise from the releases or stipulations of settlement entered into by individual herdowners with the holders of their notes, which are asserted as affirmative and complete defenses as to the claims of the relevant plaintiffs by the defendant noteholders. Because the settlements involved here do not on their face appear to be voidable under § 29(a) of the Securities Exchange Act (which renders void any waiver of compliance with the provisions of the Act), plaintiffs' attack on the settlements or releases executed by them would clearly present individual issues as to the circumstances surrounding the obtaining of the release. Compare Pearlstein v. Scudder & German, 429

F.2d 1136 (2d Cir. 1970); Cohen v. Tenney Corp., 318 F.Supp. 280, 283–284 (S.D.N.Y.1970).

These factors, which indicate the unmanageability of the proposed litigation, reaffirm our conclusion that the motions for class status and consolidation should be denied.

## B. The Motions to Dismiss.

Defendants State Mutual, Richard H. Wilson and C. John McLoughan, Jr., ("the State Mutual defendants") move, pursuant to Rule 12(c), Federal Rules of Civil Procedure, to dismiss the *O'Shea* complaint as against them for failure to state a claim; and the *Bickart* complaint insofar as it makes claims on behalf of Mortion Bickart, Thomas A. Koenig, Max B. Milberg, Benjamin Jagendorf, George Popkin and Irving J. Taylor.[5] West End Livestock, which acquired all of State Mutual's herdowner notes on December 30, 1970 following Black Watch's filing in bankruptcy, moves to dismiss the *Bickart* complaint for failure to state a claim against it. Since West End adopts the arguments of State Mutual on these motions, we deal with them collectively unless otherwise noted.

The motions to dismiss are founded upon four principal grounds: first, that the moving defendants (hereafter the "State Mutual defendants") had—to use their own words—"nothing to do with any of the underlying transactions between Black Watch and the pre-prospectus purchasers" or the *Bickart* purchasers who purchased prior to October, 1969; second, that any rights of rescission the pre-prospectus purchasers may have had under § 12 of the 1933 Act are time-barred; third, that plaintiffs have no federal claim arising out of the alleged post-transaction fraud (the lulling and modification scheme whose allegations are described in the class action discussion, *supra*) since the alleged fraud was not in connection with a sale or purchase, but merely the holding or retention of securities;[6] and fourth, that this court lacks subject matter jurisdiction over the pendent state law claims against the State Mutual defendants because there is no substantial federal claim to which the state claims can append.

There is an additional and purely procedural dispute between the parties on this motion. Plaintiffs claim that defendants' references to factual matters outside the pleadings convert the motion into a "speaking motion" pursuant to Rule 12(b), Federal Rules of Civil Procedure, in effect a motion for summary judgment; while defendants insist their motion is addressed solely to the pleadings. Plaintiffs have already filed a motion for summary judgment which raises many of the issues involved in the present motion. We stayed determination of the summary judgment motion by endorsement dated June 29, 1973, pending disposition of the class action motion. Since we find that most of the issues now raised may be in any event more fully dealt with in the form of a motion for summary judgment, we deal with the present motion to dismiss strictly as a Rule 12(c) motion for judgment on the pleadings. Any matters not presently before us or raised by plaintiffs' motion for summary judgment may (and indeed properly should) be raised in the form of a cross-motion for summary judgment by the State Mutual defendants.

### I.

## State Mutual's Alleged Liability as a Controlling Person.

■ Defendants' contention that on the face of the complaint they "had nothing to do with any of the underly-

---

5. The *Bickart* plaintiffs whose claims are sought to be dismissed on the present motion purchased their herds prior to the time State Mutual obtained control of Black Watch in October, 1969.

6. For purposes of this motion, the State Mutual defendants are willing to assume that the underlying Black Watch contracts were securities within the meaning of the 1933 Act. See § III, *infra*.

ing transactions" between Black Watch and the pre-prospectus purchasers arises from the allegations of the complaint that all pre-prospectus purchases occurred prior to May 26, 1969 (*O'Shea* Complaint, Paragraph 3(b)), while State Mutual did not acquire its equity position (making it an alleged control person of Black Watch under § 15 of the 1933 Act, 15 U.S.C. § 77*o*, and § 20 of the 1934 Act, 15 U.S.C. § 78t until October, 1969. (*O'Shea* Complaint, Paragraph 12). State Mutual designated defendants Wilson and McLoughan as directors of Black Watch following acquisition by State Mutual of its 50% equity position in Black Watch. Accordingly, as defendants claim, they cannot, as a matter of law, be liable for any claims arising out of transactions before that time.

State Mutual's contention is unpersuasive, since it rests on the faulty premise that the complaint charges it only with wrongful conduct subsequent to its acquisition of control in the Fall of 1969. In fact, the *O'Shea* complaint alleges, in addition to control person liability, State Mutual's participation (while a mere lender) as an aider and abettor and coconspirator in certain allegedly fraudulent conduct substantially pre-dating its formal acquisition of control of Black Watch. (*O'Shea* Complaint, Paragraphs 7, 14, 16, 17, 18, 19, 20, 26). Concededly, the complaint is not a model of clarity with regard to the "pre-control" claims, particularly against the moving defendants, but further discovery or a motion for a more definite statement— not dismissal—are defendants' proper remedies at this time. What we have said regarding the alleged liability of the moving defendants as to the *O'Shea* purchasers applies equally to the *Bickart* purchasers, since defendants claim that all but two of the named defendants in *Bickart* purchased before State Mutual became a control person in October, 1969.

The motions are denied insofar as they seek dismissal of the claims against the State Mutual defendants in connection with the underlying purchase transactions involving either group of plaintiffs.

## II.

### *The § 12 Claims*

■ The moving defendants are on firmer ground in their assertion that the *O'Shea* plaintiffs have not properly stated a claim under § 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*. § 13 of the 1933 Act, 15 U.S.C. § 77m provides that § 12(1) suits must be brought *both* within one year of discovery (actual or constructive) of the violation on which it is based *and* within three years after the security was bona fide offered to the public. As noted above, compliance with the statute of limitations is an essential element of a § 12 action, and must be affirmatively pleaded. (See p. 11, *supra*.) The complaints here have not met that requirement. Although the *O'Shea* complaint alleges that plaintiffs' investment contracts were sold "in our [sic] about the year 1967 through May 26, 1969 . . . ." it does not appear: first, when the security purchased by the *O'Shea* plaintiffs was *first* offered to the public and, second, precisely when each named plaintiff purchased his herd. Consequently, the motion is granted as to the § 12(1) claims for failure to plead compliance with the statute of limitations.

## III.

### *The Post-Transaction § 10(b) Claims.*

The moving defendants argue that, even assuming the underlying transactions between Black Watch and the herdowners constituted the sale of securities, plaintiffs' claims of post-transaction fraud must be dismissed since they were not "in connection with the purchase or sale of any security," as required by § 10(b) of the 1934 Act and Rule 10b–5 thereunder, and the rule of Birnbaum v. Newport Steel, Inc., 193 F. 2d 461 (2d Cir. 1952).

We adopt defendants' acquiescence arguendo that Black Watch was selling securities in the nature of investment contracts since the particulars of the complaint bring the Black Watch program within a long line of cases where purported sales of tangible property, service contracts or both, were held to be investment contracts. S.E.C. v. Glen Arden Commodities, Inc., 493 F.2d 1027 (2d Cir., 1973); S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); Continental Marketing Corp. v. S.E.C., 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968); Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953), cert. dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954); S.E.C. v. Lake Havasu Estates, 340 F.Supp. 1318 (D.Minn.1972); S.E.C. v. Payne, 35 F.Supp. 873 (S.D.N.Y.1940). *See also* S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 481–482 (9th Cir. 1973); S.E.C. v. Orange Grove Tracts, 210 F.Supp. 81 (D.Mass.1962); American Dairy Leasing Corp., 1971–2 CCH Fed.Sec.L.Rep. ¶ 78,584 (S.E.C. 1971). However, the moving defendants challenge plaintiffs' theories that (1) plaintiffs were "forced sellers" of their securities at the time of the Black Watch bankruptcy; (2) the various modifications of these securities (as described above in the class action discussion) were "sales" of new securities to Black Watch investors, and (3) that transactions in herdowner notes between Black Watch and the noteholders are "sales" on which plaintiffs have § 10(b) standing to sue.

### A. The Forced Seller and Aborted Seller Claims.

The State Mutual defendants challenge plaintiffs' asserted jurisdictional predicate for the alleged post-transaction fraud, that they were "forced sellers" of their securities when Black Watch entered liquidation, or aborted sellers since defendants' fraud induced them to retain their securities well past the time (but for the alleged fraudulent concealment of their rights of recission and Black Watch's financial decline) they would have rescinded their initial purchase transactions.

The *Birnbaum* doctrine that only those alleging fraud in connection with a purchase or sale of securities have standing to sue under § 10(b) has been consistently reaffirmed by courts in this and other circuits. See Haberman v. Murchison, 468 F.2d 1305, 1311 (2d Cir. 1972); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 967, 970 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Greenstein v. Paul, 400 F.2d 580, 581 (2d Cir. 1968); O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964); Landy v. Federal Deposit Insurance Co., 486 F.2d 139 (3d Cir. 1973); Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972); City National Bank v. Vanderboom, 422 F.2d 221 (8th Cir.) cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970). Accordingly, most courts which have considered the issue hold that there is no federal right of action for fraud allegedly committed for the purpose of inducing the *retention* of a security, as distinguished from its purchase or sale. Levine v. Seilon, Inc., 1970–71 CCH Fed.Sec.L. Rep. ¶ 92,941 (S.D.N.Y.1970), aff'd 439 F.2d 328 (2d Cir. 1971); Feldman v. Hanley, 59 F.R.D. 299 (S.D.N.Y.1973); Morrow v. Schapiro, 334 F.Supp. 399 (E.D.Mo.1971).

In view of this formidable list of authorities, plaintiffs' § 10(b) claims as defrauded forced sellers, or aborted sellers, must rest, if at all, upon the few cases which have bruised the tough skin of *Birnbaum* and its progeny. In Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965), the first such case, plaintiffs maintained accounts at the defendant's brokerage firm. They alleged they had told their brokers they wished to sell certain securities, but that they were induced by fraudulent misrepresentations to defer their sale, and ultimately sold out at a greater loss than they would have incurred but for the alleged

fraud. The court noted that neither § 10(b) nor Rule 10b–5 required that a sale *immediately* follow the alleged fraud, and held that since plaintiffs had clearly indicated their intent to sell and subsequently *completed* their sales, the alleged fraud was directly connected to the timing and circumstances of the sale and accordingly stated a § 10(b) claim.

In Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967) cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1970), a class A stockholder of Crown Finance Co., Inc. sued Beneficial, alleging that Beneficial acted in concert with Crown's officers and directors to defraud class A shareholders in connection with Crown's merger into Beneficial. Beneficial effected the merger by acquiring 95% of the class A shares through a tender offer and then, pursuant to a statutory short-form merger, forced the remaining minority shareholders to sell their shares for cash. The court held that plaintiff was a "seller" even though he had not yet tendered his shares, since Crown was at that point non-existent, and in order to realize any value whatever for his Crown stock, plaintiff "must now exchange his shares for cash" from the defendant. Plaintiff was, therefore, a "forced seller," a position he would not have been in but for the alleged fraud committed in the merger transaction. *Accord*, Dudley v. Southeastern Factor & Finance Corp., 446 F.2d 303 (5th Cir.) cert. denied sub nom. McDaniel v. Dudley, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971).

In Travis v. Anthes Imperial Limited, 473 F.2d 515 (8th Cir. 1973), defendant's alleged misrepresentations induced plaintiffs to believe that defendant would offer them a tax-free exchange or offer for their stock after a tender offer to certain other shareholders had expired. Plaintiffs further alleged that following defendant's accession to control of the target corporation, it controlled the market in the stock and dictated a lower price to plaintiffs for the stock (which they had allegedly retained in reliance on defendant's misrepresentations) than they could have obtained earlier. Relying on *Vine* and *Stockwell*, the court held that such allegations stated a § 10(b) claim.

In Manor Drug Stores v. Blue Chip Stamps, 492 F.2d 136 (9th Cir. 1973), an antitrust decree required defendant to make a public offering to its retailer customers of half of its stock. Plaintiffs claimed that the offering prospectus unduly emphasized negative elements to discourage the offerees from purchasing. The Ninth Circuit held that a § 10(b) claim existed in favor of the aborted purchasers, reasoning that § 3(a) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(13) defines a "purchase" to include a "contract to purchase," and that the antitrust decree was equivalent to such a contract.

Plaintiffs here propose to squeeze themselves into the narrow exceptions to *Birnbaum* carved out by these decisions. In substance, they claim that they, like the *Manor Drug* buyers, were a defined class of putative sellers who had a defined right to sell (a "put" compared to the "call" in *Manor Drug*) both by reason of their alleged § 12 right of rescission and the cancellation clause in their maintenance contracts; that they were fraudulently induced, like the *Stockwell* and *Travis* plaintiffs, to retain their securities so that their continuing note and maintenance installments would keep Black Watch afloat; and that they became forced sellers, like those in *Vine*, when Black Watch filed in bankruptcy and its creditors foreclosed on their liens covering the cattle.

■ The analogies plaintiffs suggest are unpersuasive and for the reasons stated below, we find that they have failed to state § 10(b) claims predicated either on the holding of securities culminating in a "forced sale" at the time of Black Watch's filing in bankruptcy or an "aborted sale" predicated on the cancellation clauses of their maintenance agreements or their alleged right of rescission.

1. *The Aborted Seller Claim.* We begin with the proposition that the *Birnbaum* standing requirement should be construed to effect Congress' purpose: to preserve the integrity of securities transactions. Herpich v. Wallace, 430 F.2d 792, 806–807 (5th Cir. 1970), and cases cited therein. The standing requirement has a functional significance as well: if a plaintiff cannot allege that he bought or sold the security involved in the fraud, his claim must fail "both on proof of loss and the causal connection with the alleged violation of the Rule." Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547 (2d Cir. 1967); Britt v. Cyril Bath Co., 417 F.2d 433, 435–436 (6th Cir. 1969). Section 3(a) of the Exchange Act recognizes *contracts* to purchase or sell as "purchases" and "sales", presumably because the existence of a contractual relationship between the parties is likely to provide the same causal link and ready measure of damages. Accordingly, the § 10(b) standing requirement embodies Congress' judgment that without these elements, there will be little evidence that *but for* the fraud a § 10(b) claimant would have made a different investment choice than he did.

The *Manor Drug* court relied heavily on the premise that the antitrust decree involved there was equivalent to a contract to purchase: it required defendant "to offer particular securities to a specific, identifiable group of non-stockholding retailer users of Blue Chip Stamps . . . at a fixed price and in a fixed amount." The court found the terms of the offering so inviting as to provide a "prima facie" basis for the inference that, but for the fraud, properly informed members of the plaintiff class would have accepted the offer.

For several reasons, we decline to apply the rationale of *Manor Drug* to the facts presented here. First, the purported "contracts to sell" involved here are nothing of the kind. Plaintiffs point first to the cancellation provisions of their initial maintenance contracts, a "put" which, as they claim, *would* have been exercised but for defendants' alleged fraudulent omissions. But a cancellation clause is not a contract to sell securities; it creates no obligation on the part of the investor to part with his security at any particular time or price; it is indicative of neither causation, factual or inferable, or proof of loss. Indeed, the clause is not indicative of any intent to sell whatever. It was merely a boiler plate clause inserted in all herdowner contracts.

Nor do we find persuasive plaintiffs' argument that a statutory or common law right to rescind the underlying sales transactions is the equivalent of a "contract to sell or otherwise dispose of" a security. As the court noted in *Mount Clemens, supra,* the few cases which have granted standing to persons who did not actually buy or sell securities involved "the existence of a contractual relationship between the parties which elevated the plaintiffs to the status of statutory purchasers or sellers." (464 F.2d at 345.) A right of rescission, apart from not being a contract within the plain terms of § 3(a), does not even meet the "equivalency" test applied in *Manor Drug.* The essence of a contract —and the reason a § 10(b) "sale" can be inferred from its existence—is that it creates enforceable rights and obligations between the parties. A right of rescission supports no such inference. It represents only an inchoate, highly contingent "right" to sell which must be pleaded and proven in court, is *not* contracted for by the parties, and *not* indicative of any established intent to sell. Indeed the parties may (as is claimed to have been the case here) not even know of its existence.

Plaintiffs claim the rub lies there: if they had known of the right, they surely would have exercised it—the fraud lay in concealing it. We disagree. Even assuming the unlikely case where *every* investor takes action on the disclosure of his right to rescind and *no* investor misjudges his investment, we believe it would do violence to Congress' clear intention in providing a statutory

right to rescind if a fraud claim could be predicated on its very non-disclosure. Liability for the sale of unregistered securities is very nearly strict liability. Unlike a § 10(b) claim, scienter need not be pleaded or proven; mere proof of the sale of unregistered securities is sufficient. For such a drastic remedy Congress accordingly provided (in § 13 of the Securities Act, 15 U.S.C. § 77m) a short, double-barrelled limitations period of one and three years. In view of the familiar canon of statutory construction that parts of a statute are to be read together, in *pari materia,* Congress can hardly have intended to create a strictly limited cause of action for rescission, whose timely prosecution is essential to its survival, see p. 11 *supra,* and *also* to permit a § 10(b) fraud claim for failure to call investors' attention to the existence of the right. Such a construction would read § 13 out of the statute, since *every* rescission action would (or could) thereby be converted into a fraud claim with a six-year limitations period.

◼ We conclude that neither the cancellation clause in investor maintenance contracts, nor the alleged right of rescission are "contracts to sell or otherwise dispose of" securities within the meaning of § 3(a) of the Exchange Act.

2. *The Forced Seller Claim.* Plaintiffs next characterize themselves as "forced sellers" by reason of Black Watch's filing in bankruptcy. They analogize themselves to plaintiffs in *Stockwell* and *Travis* who were fraudulently induced to defer sale of their securities; and to the *Vine* plaintiffs who became forced sellers through a short-form merger. The cases are not controlling here. In *Stockwell,* the allegation that plaintiffs had clearly indicated their intent to sell would, if proven at trial, have established both a ready measure of damages (the stock price at the time of the aborted sale as against the eventual sale price) and the requisite connection between the alleged fraud and the timing of the eventual sale. Both of these elements, as noted above,

are crucial to the purpose of the § 10(b) standing requirement, and both are absent here.

In *Travis* the alleged fraud was clearly "in connection with" completed sales of securities; it was the essence of the fraud that plaintiffs not sell their securities so that defendants therein could manipulate the market in the securities involved and force a lower sale price upon plaintiffs. The fraud, therefore, was intimately related to the timing and the circumstances of the sale. Although in *Vine* there was no sale, the court understandably found its practical equivalent because the plaintiff had no choice but to cash in his otherwise worthless Crown securities; such a "forced sale" was of course linked to the alleged fraud since plaintiff claimed that the merger was arranged in a way intended to undercompensate class A shareholders.

◼ Such is not the case presented here since defendants' alleged fraudulent omissions were not in connection with Black Watch's bankruptcy, which plaintiffs claim was a "sale," and in any event, we find that in the circumstances presented, a bankruptcy liquidation is not a § 10(b) sale. Here, unlike *Vine, Stockwell* and *Travis,* the alleged fraudulent concealment and lulling activity had no connection with Black Watch's bankruptcy nor was it for the purpose of *causing* it. To the contrary, the purpose of the alleged fraud, as plaintiffs characterize it, was to keep Black Watch afloat and herdowners paying on their notes and maintenance contracts, not to drive it into bankruptcy. Indeed, Black Watch was as unwilling a "seller" in bankruptcy as the herdowners. But for the alleged fraud, the bankruptcy would have come earlier, not later, precisely the result Black Watch wished to avoid. The bankruptcy was only the remote consequence of the eventual failure of alleged fraud in connection with the *holding* of securities, not the *occasion* for fraud in connection with a *sale.*

◼ Although, as the *Manor Drug* court observed, "Congress and the Com-

mission cannot have intended to prohibit such fraudulent practices if they failed but not if they succeeded," as Black Watch allegedly did here for some time, Congress did not intend § 10(b) to be a remedy for all investors injured by any fraudulent practices. The finding of a forced sale here would eviscerate the purchaser-seller requirement and grant standing to any shareholder of a bankrupt corporation who could point to a misrepresentation made by the issuer at any time prior to bankruptcy. We conclude that the bankruptcy "sale" cannot be the predicate for a § 10(b) claim. Cf. Landy v. F. D. I. C., *supra.*

### B. Modification of the Underlying Investment Contracts.

■ 1. *Exchange of Herdowner Notes.* As noted in the class action discussion, the *O'Shea* and *Bickart* complaints allege that several modifications of the underlying set of contracts between Black Watch and herdowners constituted the sale of new securities. The first alleged new securities transaction involves the exchange by herdowners of their original promissory notes (given in payment for their herds) for new notes containing extended payment terms and waiver and estoppel provisions. (*O'Shea* Complaint, Paragraph 18(e).) The herdowners claim that the waiver provisions were intended to deprive them of, or conceal from them, their right to rescind under § 11 of the Securities Act.

In answer, State Mutual proffers two principal arguments that the exchange of notes does not constitute a new securities transaction. They claim first that the herdowner notes were not securities within the meaning of the Securities Act because they were given by the herdowner, not the "issuer," and consequently had the same character as (for example) the ordinary promissory note given by the installment purchaser of a refrigerator or a used car. They also assert that the "economic reality" of the

issuance of the new notes was that Black Watch simply gave herdowners a welcome break in agreeing to extensions of time for them to make good on their original obligations to Black Watch. This kind of transaction, State Mutual argues, falls outside Congress' intent in creating the securities laws—the protection of the integrity of the securities markets.

■ The arguments are not persuasive. The federal securities laws, and in particular the definition of a security in § 3 of the Securities Act, 15 U.S.C. § 78c, are to be construed "flexibly, not technically and restrictively." Superintendent of Insurance of State of N. Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); S. E. C. v. W. J. Howey, *supra*; Movielab v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir. 1971); Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir. 1972).

It does not strain the language of the Securities Act to conclude that the exchange of herdowner notes was an exchange of "securities". Both § 2(1) of the 1933 Act and § 3(a)(10) of the 1934 Act provide that "any note" is a security; the only exceptions are for short-term (not exceeding nine months) commercial paper, see § 3(a)(3) of the 1933 Act, § 3(a)(10) of the 1934 Act. On the face of the relevant statutes, therefore, the herdowner notes were in themselves securities, even divorced from the other elements of the investment contract.

The State Mutual defendants' citation of Lino v. City Investing Co., 487 F.2d 689 (3rd Cir. 1973) actually favors plaintiffs' position. *Lino* involved the giving of a personal promissory note in exchange for the right to operate a franchise sales center. The court held that, given the commercial rather than investment context in which notes were given, the note maker was buying a con-

tractual right, not a security.[7] The note maker was to operate the franchise himself, and there was no evidence that the note was given to provide venture capital to the franchisor.

■■■■ The State Mutual defendants next cite Zeller v. Bogue Electric Manufacturing Co., 476 F.2d 795, 800 (2d Cir. 1973), where in deciding that a note given by a corporation which borrowed money from its subsidiary was a security for § 10(b) purposes, the court reserved decision on the question whether "every transaction within the introductory clause of § 10, which involves promissory notes, whether of less or more than nine months maturity, is within Rule 10b–5." (476 F.2d at 800.) We of course need not decide that question here since we are required to deny a motion to dismiss if, on any state of facts supporting the allegations of the complaint, plaintiffs have stated a valid claim. They have done so there, since such case law as there is on the issue consistently indicates that even a single promissory note (whether or not issued by a "conventional" issuer to a public

investor) is a proper predicate for a § 10(b) claim. See Zeller v. Bogue, *supra;* Sanders v. John Nuveen & Co., Inc., *supra;* Movielab Inc. v. Berkey Photo, Inc., *supra;* Lehigh Valley Trust Co. v. Central Nat'l Bank of Jacksonville, 409 F.2d 989 (5th Cir. 1969), and cases cited therein.

■■■ The only case which is factually similar to the present one is S. E. C. v. Associated Gas and Electric Co., 24 F.Supp. 899 (S.D.N.Y.1938) aff'd 99 F.2d 795 (2d Cir. 1938) in which the stamping on certificates of indebtedness of a recital that investors had agreed to an extension of maturity was held to constitute a sale of securities.[8] State Mutual argues that the extension in *Associated Gas* placed the investor's money at risk for additional time, while here it was Black Watch's right to payment that was placed at further risk.[9] The argument is unconvincing for several reasons. First, neither the statutory definition of a note nor the broad scope of § 10(b) which extends to purchasers *and* sellers of securities (assuming the herdowners were "sellers" of their

---

**7.** The *Lino* court noted that the definitional sections of the Securities Act are introduced by the phrase "unless the context otherwise requires" in holding that not all notes are securities. Other cases have followed the *Lino* rationale in distinguishing a "commercial" from an "investment" context, see Joseph v. Norman's Health Club, Inc., 336 F. Supp. 307 (E.D.Mo.1971) (promissory notes issued in return for lifetime health club memberships) ; S. E. C. v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3 (S.D.N.Y. 1968) (note in return for a personal loan).

**8.** For purposes of this discussion, we assume that any "sale" for purposes of § 5 of the 1933 (relating to the registration of securities) Act, is also a "sale" for purposes of § 10(b) jurisdiction. Such an assumption is warranted because, if anything, a lesser showing of a "sale" appears to be required for jurisdictional purposes in a § 10(b) fraud case: by the plain wording of the statute, the deception must be only "in connection with" a purchase or sale and this phrase has been given a broad construction, in view of § 10(b)'s remedial purpose. See Supt. of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 10–12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Moreover, the S.E.

C.'s own rules, which are entitled to substantial weight, Zeller v. Bogue Electric Co., 476 F.2d 795, 800 (2d Cir. 1973) ; Skidmore v. Swift, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), implicitly provide for a somewhat less restrictive definition of a § 10(b) sale than a § 5 sale. See, e. g., 17 C.F.R. 231.4412 (1961), in which the S.E.C. exempts short-term commercial paper from registration under § 5, while providing that the antifraud rules still apply.

**9.** Implicit in this argument is the contention that the plaintiff-investor need be the notebuyer rather than the maker (seller) to state a § 10(b) claim. However, it is clear that there *can* be a § 10(b) purchase or sale of securities where, as here, the investor is *not* the payee or "buyer" of a note, but the "issuer," Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir. 1971), aff'g per curiam 321 F.Supp. 806 (S.D.N.Y.1970) ($10,500,000. in notes payable over twenty years issued by one publicly held corporation to another public corporation in exchange for assets), MacAndrews & Forbes Co. v. American Barmag Corp., 339 F.Supp. 1401 (D.S.C.1971) (bill of exchange issued to purchase machinery was "a form of note".)

notes) suggests that the fraud alleged here falls outside the type of transaction proscribed by the securities laws. Indeed, the definition of a security embodies a flexible principle, "one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," S. E. C. v. W. J. Howey, *supra*, at 299; "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, *supra*, at 336.

Second, while Black Watch's right to payment was, in formal terms, placed at additional risk, the allegations of the complaint claim precisely the opposite, that is, although Black Watch *purported* to "give herdowners a break" on their notes, in fact, as plaintiffs allege, their investment was placed in increasingly grave jeopardy by the same passage of time the State Mutual defendants characterize as a concession to herdowners.

Third, the herdowners were not simply "given" extra time on their notes; they gave something up: the new notes allegedly contained waiver of defenses and estoppel provisions by means of which the State Mutual and Black Watch defendants allegedly attempted to defraud herdowners of their alleged right to rescind.[10]

We conclude that the statutory definition of a security, the relevant case law, and the investment character of the transactions in which the notes were issued indicate that the alleged exchange of herdowner promissory notes was the kind of transaction contemplated by the securities laws and that plaintiffs have stated a claim.

■ 2. *The Exchange of Maintenance Contracts.* The second alleged new security is the substitution for the maintenance contract entered into at the time of the initial sales transaction for a modified maintenance contract providing for reduced monthly charges. (*O'Shea* Complaint, Paragraph 18(f).) We find that an exchange of contracts in the unusual circumstances alleged here constitutes the sale of a security for purposes of § 10(b).

■ Although there appears to be no authority precisely in point, we are guided both by the rule that the securities laws should be construed with an eye to their remedial purpose and by decisions in analogous cases. We begin with the general proposition that an exchange of securities is a securities transaction for purposes of § 10(b) even when there is no purchase in the usual commercial sense. Dasho v. Susquehanna Corp., 380 F.2d 262 (7th Cir. 1967); H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y.1960) (exchange of securities pursuant to merger). Similarly, the sale of one security, subsequently convertible into another constitutes the simultaneous offer and sale of both "securities", Crowell-Collier Publishing Co., S.E.C. Release No. 33–3825 (1957), 1957–61 CCH Fed.Sec.L.Rep.

---

10. In Shaw v. Dreyfus, 172 F.2d 140 (2d Cir.), cert. denied, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949) the Second Circuit held that a "purchase" or "sale" for purposes of § 16(b) of the 1934 Act meant an acquisition or disposition of securities for consideration. After International Controls Corp. v. Vesco, et al., 490 F.2d 1334 (2d Cir. 1974), however, it is not clear whether consideration must pass between the parties for purposes of determining whether a § 10(b) purchase or sale has taken place. The *Vesco* Court relied heavily on the rule that the securities laws are to be interpreted flexibly, in order to effect Congress' purposes, in holding that ICC's disposal of portfolio securities by way of a dividend in kind to ICC shareholders was a § 10(b) sale even though the shareholders parted with no consideration: ". . . we find a rote emphasis on consideration inconsistent with the broad scope of protection under § 10(b) for those who engage in transactions eventuating in the acquisition or disposition of securities." At 1346.

The question whether the narrow rule of *Shaw*, or the more flexible one in *Vesco* controls, is not crucial to our finding here. The exchange of notes involved the passing of fresh consideration between Black Watch and the herdowners since Black Watch "gave" an extension of time, the herdowners "gave" a waiver and estoppel provision.

¶ 76,539 and, as noted above, the mere stamping on certificates of indebtedness of a recital of extension of maturity is a sale of a new security, S. E. C. v. Associated Gas & Electric Co., *supra*. See also United States v. Wernes, 157 F.2d 797 (7th Cir. 1946) (exchange of beneficial trust certificates for limited partnership certificates representing the same underlying oil leases constitutes a "sale").

■ Certain general principles emerge from the somewhat disparate factual patterns in these cases. § 10(b) by its terms embodies the judgment that "purchases" and "sales" of securities present the greatest possibility of fraud. Accordingly, such cases as *Associated Gas* and *Wernes* seem to stand for the proposition that a purchase or sale arises when the nature and terms of an investor's involvement in a business enterprise are substantially altered by the creation of new rights or obligations. Construing the pleadings liberally as we are required to do and giving due weight to the investment context of the alleged fraud, we find, for the reasons elaborated below, that the exchange of maintenance contracts meets this test and is a sufficient jurisdictional basis for the assertion of a § 10(b) claim.

The State Mutual defendants nevertheless take the position that (1) the cases discussed all involve modifications of "conventional" securities and are consequently irrelevant to the question whether modification of investment contracts constitutes a § 10(b) jurisdictional event and (2) modification of only a *single element* of an investment contract cannot constitute the sale of a "new" security because the element so modified does not in itself meet the definition of an investment contract articulated in S. E. C. v. W. J. Howey, *supra*, and (3) modification of maintenance contract does not require a new "investment decision," but simply an adjustment of a pre-existing, binding contract.

■ All three arguments are wide of the mark. There is no basis in law or logic for distinguishing between "conventional" securities and investment contracts for purposes of a § 10(b) claim. Once it is determined that an investment contract is a "security," sufficient allegations of fraud in connection with its purchase or sale entitle investors to the protection of the same securities laws available to investors in "conventional" securities. There exists no bifurcated standard for "conventional" and "investment contract" securities. Consequently, State Mutual's position— that (for example) exercise of a warrant is a § 10(b) sale, while exchange of cattle maintenance contracts is simply a substitution of one personal obligation for another not constituting a § 10(b) event is without merit: it ignores the economic context of the latter transaction which marks it for protection under the securities laws. Plaintiffs were not cattle ranchers subcontracting some of the maintenance on their herds; they were investors who knew (we can assume) as little about cattle breeding as this court.

■ Nor is it of any consequence that the single element of a modified investment contract does not in itself meet the definition of a security: to take such a position would mean that *no* modification of a security could be deemed a purchase or sale for § 10(b) purposes. Such a conclusion, however, runs against the grain of the decisions discussed above: for example, extension of maturity dates on pre-existing certificates of indebtedness in Associated Gas & Electric Co., *supra*.

■ Finally, we disagree with the State Mutual's contention that the exchange of maintenance contracts did not represent a new "investment decision" and consequently is not a sale. The maintenance contracts, as noted above, were pivotal to the herdowner's investment "package," and required on-going payments over a period of time. The herdowner exchanging his contracts was indeed making an investment choice: whether to sell his herd immediately, or to commit himself to further substantial

payments to increase his equity by breeding more cattle and "growing" healthy ones to maturity. Without attempting to define the precise contours of a § 10(b) event, we find that threshold § 10(b) jurisdiction is established where, as here, there is alleged a substantial modification of an investment contract creating fresh rights and obligations of the parties and the investor gives some consideration, either a promise of future payments or the relinquishment of a significant right.

 3. *Exchange of Maintenance Contracts Coupled with the Grant of Additional Cattle.* The third alleged § 10(b) event, the coupling of an exchange of maintenance contracts with the grant of additional cattle without charge, (*O'Shea* Complaint, Paragraph 18(f)), also satisfies the purchase-sale requirement. The State Mutual defendants' argument, that giving free cattle cannot possibly be a purchase or sale,[11] overlooks the allegation that in accepting free animals herdowners obligated themselves to pay additional maintenance charges on them. Although our holding above that the exchange of contracts, taken alone, requires the same result here, several other authorities also support our finding.

 In Keene Corp., 1971–72, CCH Fed.Sec.L.Rep. ¶ 78,475 (S.E.C.1971), the S.E.C. held that a securities sales incentive plan in which equity shares were given as prizes constituted the sale of securities since the shares were given as an inducement to generate greater sales, representing "value" to the issuer. Similarly, in Gold Producers Inc., 1 S.E.C. 1 (1933) the giving to a shareholder of a certificate representing "free" shares of stock, subject to subsequent cash assessments was held a disposition of the stock for value, and hence an offer and sale. Thomas v. United States, 227 F.2d 667 (9th Cir. 1955) held that a written option for a sales distributorship as an inducement to the purchase of additional stock in a corporation was a sale, in

view of the language of 15 U.S.C. § 77b(3) that "[a]ny security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been offered and sold for value." The principle implicit in these cases—that consideration sufficient to find a disposition of a security for value is not limited to money or property—guides us here. In accepting "free cattle," Black Watch investors not only increased maintenance charges, but, as they allege, continued participation to their detriment in the entire Black Watch program, including continuing note and maintenance payments on their original herds.

Finally, the giving of free cattle, coupled with an obligation to pay maintenance on them closely resembles the more common situation where a purchaser of assessable stock (stock subject to resale by the issuer in the event of the holder's failure to pay assessments levied on it) agrees to pay current or future assessments on it. S.E.C. Rule 136, 17 C.F.R. § 230.136 provides that a sale of securities shall be deemed to be made to the holders of such stock when a "stockholder shall pay or agree to pay all or any part of such an assessment." We think the glove fits. Taken together, the "free" cattle coupled with the obligation to pay periodic maintenance charges on them is like the "sale" of assessable stock, and in any event within the principles in *Keene, Gold Producers* and *Thomas.* We conclude that a § 10(b) sale occurred at the time of this alleged modification of the underlying investment contracts.

 4. *Periodic Payments on Maintenance Contracts and Promissory Notes.* Plaintiffs next assert that *each payment* on a maintenance contract or a promissory note constituted the sale of a new security for purposes of § 10(b). As to the maintenance payments, while the question is by no means free from

 11. See note 10, *supra.*

doubt, we conclude they are "sales" and that the motion to dismiss plaintiffs' § 10(b) claims predicated on them must be denied.

As noted earlier, we are impressed by the similarity between the nature of the maintenance contracts involved here and assessable stock, which S.E.C. Rule 136, 17 C.F.R. § 230.136(c) defines as "subject to resale by the issuer . . . in the event of a failure of the holder of such stock to pay any assessment levied thereon." Rule 136(a) provides that a "sale" occurs when a stockholder pays or agrees to pay all or part of such assessment. We believe the analogy is apt. Viewing either the entire Black Watch investment contract as an assessable security, or simply the maintenance contracts alone as such a security, they were subject to periodic assessments by Black Watch. Although a herdowner was *required* to enter into a maintenance contract at the time he bought the program (and hence "agreed to pay" assessments within the meaning of the rule), the contract was cancellable. Consequently, each month brought on an additional "agreement to pay" and a payment, both of which are "sales" under Rule 136. The similarity runs deeper yet. An issuer of assessable shares has the right to resell stock in the event of a failure to pay an assessment on it. In the same way, Black Watch allegedly retained security interests in the cattle it sold to collateralize the unpaid investment contracts. It does not appear from the present record whether Black Watch would have recourse to the cattle on non-payment of a maintenance contract. However, since we are required to deny a motion to dismiss if on any state of facts plaintiffs have stated a claim, we assume that they did, and that the analogy supports plaintiffs' § 10(b) claim predicated on the ongoing maintenance payments.

However, we need not rely solely on the analogy. Section 2(3) of the Securities Act, 15 U.S.C. § 77b(3) defines the terms "sale" and "sell" to "include every contract of sale or disposition of a security *or interest in a security,* for value." (emphasis added.) In Gross v. Independence Shares Corp., 36 F.Supp. 541 (E.D.Pa.1941) plaintiff brought an action to recover money he paid the defendant on a "contract certificate," alleging fraudulent misrepresentations and omissions in its sale. The contract provided for plaintiff's payment of 120 monthly installments to the trustee of a trust under a savings plan operated by the defendant. The investor's participation in the plan was subject to cancellation at any time upon his giving notice to the trustee. Plaintiff alleged that defendants mailed various misleading written notices of payment, bulletins and financial statements in order to induce his continuing payments on his savings plan. Reasoning that each such payment increased the amount of property to which plaintiff had equitable title, the court held there was a purchase of an "interest in a security" each month, within the meaning of § 2(3).[12]

In Securities and Exchange Commission v. North American Finance Co., 214 F.Supp. 197 (D.Arizona 1959), the S. E.C. sued a corporation to enjoin certain allegedly deceptive practices in the sale of its stock. Defendants had been selling the stock to members of the public on a long term subscription basis. It was the defendant corporation's practice to issue shares to subscribers immediately for the number of shares paid for, but the subscription was cancellable by the investor at any point. The court held that the sale of the stock on a subscription basis constituted a "continuing offer to sell" and that the sale was not consummated until all shares subject to the subscription had been issued and delivered to the purchaser.

Consequently, the State Mutual defendants' argument that the similarity of maintenance assessments and assessa-

---

12. Although *Gross* was a § 12(2) action for rescission, we see no reasonable basis for distinguishing a § 12(2) sale from a § 10(b) sale. See note 8, *supra.*

ble stock is a mere play on words lacks force, since *Gross, supra,* and *North American Finance Co., supra,* also support our conclusion. The crux of those decisions, as we read them, is that plaintiffs' rights to continue purchasing the installments on their contracts, or to cancel at their option, amounted to a *series* of investment decisions to purchase, (with a corresponding increase in their equity in the issuer) and, accordingly, a *series* of sales by the issuer. The contracts were executory, or open, and in practical effect they involved the same sort of investment choice as, for example, the decision to purchase monthly 100 shares of General Motors stock (or, more true to life, one share per month). The maintenance contracts fall within the general principles of *Gross* and *North American.* Each payment involved additional investment in the investment contract, in the hope of increasing the investor's equity in the form of healthier, larger, stronger cattle and additional progeny. Indeed, the maintenance contract was the pivot on which investor expectations turned, since *only* by maintaining the herds could their equity "grow," or even "survive." Conversely, the choice to cancel the maintenance contract, assign it to another cattle farm or liquidate the herd involved an investment choice as well, since it represents a decision to redeploy capital in other, more profitable, enterprises.

■ Application of the same principles to the question whether promissory note payments were sales of securities leads us to a different result. According to the complaints, a purchaser of a Black Watch investment contract received certificates of title covering his herd at the time of the underlying transaction. Insofar as the animals taken alone represented a § 2(3) "interest in a security," the interest was purchased at the time of the initial sale and the rights and obligations of the parties were fixed at the time of the making of the note. Each payment represented not the creation or assumption of new obligations, but the fulfillment of those previously created. There is a substantial economic and legal difference between the note payments and the maintenance payments. Each payment on a maintenance contract represented a fresh decision to further invest in Black Watch; the herdowner "bought" something each month which he did not own before which, by virtue of the cancellation clause, he was not obligated to buy. The same is not true of the note payments.

Plaintiffs argue, however, that just as their equity increased with each maintenance payment, it also increased with each note payment and that a "sale" occurred each time they reduced their debit balance. The argument is unpersuasive since first, they already had title to the cattle at the point of the underlying sale, and except in a purely technical sense acquired nothing additional by their payments; and second, their obligation to pay was fixed and non-cancellable. We conclude that the monthly note payments were not sales of securities.

5. *Exchange of Notes Between Black Watch and Noteholders.* The final set of securities transactions on which plaintiffs seek to predicate their § 10(b) claims involve the exchange of notes between Black Watch and the noteholders in 1969 and 1970. In substance, plaintiffs claim (as alleged in Paragraphs 19–24, *Bickart* Complaint and as amplified in their Memorandum of Law on this motion) that State Mutual made thorough investigation of Black Watch's financial condition and operating practices prior to loaning the corporation large sums of money (totalling some $9,000,000.) on two occasions in 1968 and 1969; that the other noteholders also investigated Black Watch prior to taking herdowner notes as collateral for loans to Black Watch, and that all the noteholders were consequently "insiders" of Black Watch who abused their positions by concealing from investors Black

Watch's circumstances in order to protect their own security interests. The purchases and sales which defendants seek to connect with this alleged fraud are transactions amongst the lenders themselves, and between the lenders and Black Watch. It is alleged that the lenders and Black Watch played "musical chairs" with herdowner notes, so that, for example, where a herdowner refused to pay on his notes, the noteholder would turn them back to Black Watch in exchange for the notes of another, less troublesome, herdowner. Plaintiffs also claim (see p. 37 Plaintiffs' Memorandum in Opposition to Motion to Dismiss) that State Mutual and the noteholders agreed to spread their risks by treating their notes as a common pool, remitting 80% of collections back to Black Watch, and subordinating State Mutual's $8,000,000. claim on its notes to the other noteholders' claims for these remittances.

Plaintiffs claim that these transactions are comparable to the line of credit transactions in notes which were the basis of a § 10(b) claim in *Lehigh Valley Trust Co. v. Central National Bank of Jacksonville*, 409 F.2d 989 (5th Cir. 1969) or the fraud on public shareholders in *Drachman v. Harvey*, 453 F.2d 722 (2d Cir. 1972) and *Supt. of Insurance v. Bankers Life & Casualty, supra.* We disagree. The cited cases all involved a purchase or sale of notes by a corporation which was itself the victim of a securities fraud. Here, however, plaintiffs were neither purchasers nor sellers in the transactions between Black Watch and the noteholders.

Plaintiffs argue that *Bankers Life, supra,* so stretched the "in connection with" language of § 10(b) that all that is now required to state an antifraud claim is an allegation of deceptive practices *touching* the purchase or sale. But *Bankers Life* did not eliminate entirely the purchaser-seller rule. That case involved a complex scheme by which Bankers Life agreed to sell all the stock of its subsidiary, Manhattan Casualty Co., to an individual purchaser. The purchaser allegedly conspired with others, through a complicated chain of transactions, to use Manhattan's own assets to pay for the stock, and thereby defraud it of the proceeds. Manhattan was clearly a seller of its securities and the court thought it irrelevant that the proceeds of the sale were misappropriated in a transaction which was analytically distinguishable from the initial securities transaction, holding that the alleged fraud touched the sale closely enough to satisfy the "in connection with" requirement.

Although *Bankers Life* appears somewhat to have broadened the "in connection with" component of § 10(b) standing, the claimant must still participate in the securities transaction, as Manhattan clearly did. Accordingly, although some courts have held that a private party not a purchaser or seller, seeking *injunctive* relief, may have standing to assert a § 10(b) violation, *Kahan v. Rosenstiel*, 424 F.2d 161 (3rd Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Mutual Shares v. Genesco, supra*; and another has suggested the elimination of the purchaser-seller requirement, *Tully v. Mott Supermarkets, Inc.*, 337 F.Supp. 834, 840 (D.N.J.1972) it is still the rule in this Circuit that the requirement be satisfied in a suit for damages. *Iroquois Industries v. Syracuse China Corp.*, 417 F.2d 963 (2d Cir. 1969); *Greenstein v. Paul*, 400 F.2d 580 (2d Cir. 1968). Since plaintiffs were not purchasers or sellers in the transactions between noteholders and Black Watch, they have failed to state a § 10(b) claim based on them.

## IV.

*Pendent Jurisdiction.*

In view of our earlier findings, defendants' motion to dismiss the pendent state law claims of usury and common law fraud is denied. The federal claims have substance sufficient to confer on this court subject matter jurisdiction over state claims arising out of the same nucleus of operative facts. *United*

Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Levering & Garriques Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933).

In view of the foregoing, the motion to dismiss is disposed of as follows:

1. The motion is denied insofar as the State Mutual defendants claim that, on the face of the pleadings, they were not involved in any alleged fraud prior to October, 1969.

2. The motion to dismiss the § 12 claims of the *O'Shea* purchasers is granted without prejudice to plaintiffs' filing an amended complaint within twenty days of the filing of this Memorandum, affirmatively pleading compliance with the Statute of Limitations.

3. The motion to dismiss on the ground that plaintiffs lack standing to sue under § 10(b) of the Exchange Act is:

(a) granted insofar as it is predicated on the "forced sale" occasioned by Black Watch's bankruptcy or "aborted sales" predicated upon the cancellation clauses in the maintenance contracts and the alleged right of rescission.

(b) denied insofar as it is predicated upon the exchange of promissory notes.

(c) denied insofar as it is predicated upon the exchange of maintenance contracts, whether or not accompanied by the grant of additional cattle.

(d) denied insofar as it is predicated upon the monthly payment of maintenance charges.

(e) granted insofar as it is predicated upon monthly payments on herd-owner promissory notes.

(f) granted insofar as it is predicated upon the transactions in notes between Black Watch and noteholders.

4. The motion to dismiss the pendent state claims of common law fraud and usury is denied.

The motions for consolidation of these actions and for a class action determination are denied.

It is so ordered.