William FRESCHI, Jr., As Trustee of William Freschi Trust, Plaintiff,

v.

GRAND COAL VENTURE, Bandler & Kass, Ground Production Corporation, William J. Werner, Jack Mitnick, Robert Sylvor, William C. Sherr, Mineral Resources Development, Inc., and H. Jean Baker, Defendants.

No. 81 Civ. 4331 (RWS).

United States District Court, S.D. New York.

Sept. 28, 1982.

Layton & Sherman, New York City, Bowker, Elmes, Perkins, Mecsas & Gerrard, Boston, Mass., for plaintiff; Daniel J. Brooks, New York City, Robert C. Gerrard, Lawrence G. Green, Boston, Mass., of counsel.

Schwarzfeld, Arnoff & Shore, P.C., New York City, for defendants; Neal Schwarzfeld, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendants have moved for summary judgment on the first count of plaintiff's amended complaint and in the alternative, for partial dismissal of plaintiff's first and second counts and summary judgment on the third count. Defendants' motion to dismiss the first claim will be denied except that the claim shall be limited as indicated below and defendants' motion with respect to the second and third claims will be denied.

This action was commenced on July 13, 1981. Simultaneously with filing his summons and complaint, William Freschi, Jr. ("Freschi") moved for a preliminary injunction to prevent defendants from dissipating their assets while the action was pending. In a decision dated August 7, 1981, this court denied that motion. Thereafter, defendants moved to dismiss the complaint under Fed.R.Civ.P. 9(b) and 12(b)(6). This court granted the motion in a decision dated November 24, 1981, with leave to replead the claims of securities and common law fraud. The breach of contract claim as to all defendants except Grand Coal and Mitnick was dismissed.[1] The court also dis-

---

1. In the original complaint, the second claim asserted a contract cause of action against all defendants, alleging that the offering documents annexed to the complaint as exhibits

missed Freschi's claim under New York's deceptive advertising statute (General Business Law § 349) as barred by the statute of limitations.

Thereafter Freschi moved pursuant to Fed.R.Civ.P. 15(a) to amend the first three counts of his complaint and to reargue the dismissal of the fourth count. In a decision dated May 26, 1982, this court granted the motion to amend the three counts and denied the motion to reargue the fourth. Freschi filed an amended complaint on March 10, 1982.

In his first claim, Freschi, as trustee of the William Freschi Trust, seeks damages for alleged fraud in connection with the offer and sale of certain coal leases, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5. Freschi's second claim alleges fraud in contravention of state common law and the third claim alleges breach of contract.

Defendants are Grand Coal Venture ("Grand Coal"), a New York incorporated organization; Ground Production Corporation ("Ground"), a Florida corporation; Jack Mitnick ("Mitnick"), a New York accountant and the venture administrator of Grand Coal; Bandler & Kass, a New York partnership engaging in the practice of law; William Werner ("Werner"), Robert Sylvor ("Sylvor") and William C. Sherr ("Sherr"), partners at Bandler & Kass as well as officers and stockholders of Ground; Mineral Resources Development, Inc. ("Mineral Resources"), a Wyoming corporation; and H. Jean Baker ("Baker"), its principal stockholder.

Freschi claims that Ground and Grand Coal were organized by certain of the defendants to fraudulently induce investment by third parties such as Freschi in a joint venture that would own leases to certain lands purportedly containing recoverable coal and provide tax shelter advantages to its investors. Freschi invested large sums in the joint venture which currently holds subleases to lands in Wyoming and previously held subleases to property in North Dakota, pursuant to a sublease agreement with Ground, which is alleged to be controlled by Werner, Sylvor and Sherr. Freschi claims that his decision to invest was based on defendants' representations that there would be sufficient quantities of economically recoverable coal discovered and mined to make a profit. He further claims that defendants warranted minimum coal reserves of 30,000,000 tons in the leaseholds in which he invested. Freschi asserts that neither the North Dakota land nor the lands for which they were exchanged contain any coal, nor did defendants ever attempt to explore a mine for coal or even concern themselves with whether coal was there. Defendants dispute Freschi's claim of fraud and argue that they have acted in accordance with the terms of the venture agreement.

According to Freschi in December, 1977 he was investigating various investment opportunities which had tax write-off advantages and profit potential. He was presented with materials for Spruce Productions, Inc. ("Spruce Productions") and considered investing in that offering until December 15, 1977 when he spoke with Werner, the president of Spruce Productions, and learned that the offering had been withdrawn purportedly because it did not comply with I.R.S. Rulings. In that same conversation Werner informed Freschi about a new offering, Grand Coal, which was to be similar to Spruce Productions. On December 19, 1977 Freschi's agent met with Werner at the offices of Bandler & Kass, and satisfied that the firm was a viable organization, tendered Freschi's check for $130,000. On December 29, 1977 Freschi executed the Grand Coal Venture Subscription Agreement ("Subscription Agreement"). In his affidavit, Freschi states that he did not receive any written documentation concerning Grand Coal until March 31, 1978 at

---

constituted the contract which defendants failed to perform. Those documents on their face failed to establish that defendants other than Grand Coal and Mitnick undertook any contractual obligation.

which time he received (a) the Mining Venture Operating Agreement, (b) the Participating Sublease, (c) the Non-Recourse Promissory Note, (d) the Security Agreement, and (e) the Offering Memorandum which was dated December 23, 1977.

Between July, 1978 and December, 1980 on various occasions Freschi claims to have inquired about the project and received information from certain of the defendants. For instance, on August 22, 1978, Mitnick sent Freschi a letter ("August 22, 1978 letter") stating that the geological evaluation of the lands in North Dakota had been completed and because there were no recoverable coal resources contained there, steps would be taken to find other property to substitute for the North Dakota land. On March 31, 1979, Mitnick again sent Freschi a letter ("March 31, 1979 letter") stating that Grand Coal had been assigned a lease in Wyoming lands as "partial replacement" for the North Dakota land. Defendants continued to make various representations concerning the progress of the venture through December, 1980.[2]

Defendants argue that summary judgment pursuant to Fed.R.Civ.P. 56 on Freschi's securities law claim is appropriate because the claim is barred by the statute of limitations. Alternatively, defendants move pursuant to Rule 12(b)(6) to dismiss Freschi's securities and common law fraud claims to the extent that they are based on alleged misrepresentations and omissions occurring after December 29, 1977, and for summary judgment on Freschi's breach of contract claim.

2. For example, in his affidavit, Freschi stated that at various times defendants Mitnick, Werner and Sherr indicated during telephone conversations that they had been contacted by a third-party investor interested in purchasing the mineral leasehold interests held by Grand Coal at a profit, that a coal slurry pipeline was being designed, and that an in situ coal plant was being discussed for the Wyoming leasehold. Freschi further asserts he was promised reports on these matters but never received them.

3. Mo.Stat.Ann. § 409.411 reads as follows:

## I

Defendants submit that Missouri's two-year statute of limitations[3] bars Freschi's securities law claim. Freschi contends that his claim survives under application of New York's six-year statute of limitations,[4] or in the alternative, under California's three-year limitations period.[5] This court finds that California's three-year statute of limitations governs in the instant action.

■ The federal securities laws under which plaintiff's first cause of action is brought do not provide for a statute of limitations. As such, this court must apply the applicable limitations period of New York, *Cope v. Anderson,* 331 U.S. 461, 464–67, 67 S.Ct. 1340, 1341–43, 91 L.Ed. 1602 (1947), along with New York's borrowing statute, C.P.L.R. § 202 (McKinney 1972), *id.; Sack v. Low,* 478 F.2d 360 (2d Cir.1973); *Arneil v. Ramsey,* 550 F.2d 774, 779–80 (2d Cir.1977). The borrowing statute reads as follows:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the state shall apply.

Thus it must be determined where the cause of action accrued.

Some federal courts have followed *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir.1977) and *Sack v. Low,* 428 F.2d 360 (2d Cir.1973) and have applied the traditional "place of inju-

No person may sue under this Section more than 2 years after the contract of sale.

4. N.Y.Civ.Prac.Law § 213(8) is the six-year statute of limitations applicable to actions based on fraud.

5. Cal.Civ.Proc.Code § 338(4) provides:
   Within three years:
   (4) An action for relief on the ground of fraud or mistake. The cause of action in such case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.

ry" test to select the place of accrual. *E.g., Bache Halsey Stuart, Inc. v. Namm,* 446 F.Supp. 692 (S.D.N.Y.1978). Others have applied the modern conflicts "significant contacts" test. *E.g., Natural Resources Corp. v. Royal Resources Corp.,* 427 F.Supp. 880 (S.D.N.Y.1977).

■ In *Haberman v. Tobin,* 466 F.Supp. 447, 450 (S.D.N.Y.1979) (dictum), I expressed my preference for the modern approach and in *State Teachers Retirement Bd. v. Fluor Corp.,* 500 F.Supp. 278, 288 (S.D.N.Y.1980), *aff'd in part, rev'd in part on other grounds,* 654 F.2d 843 (2d Cir. 1981), I chose to follow the modern conflicts approach in the class action context where unlike the "place of injury" test, the "significant contacts" test "provides a reasoned means for selecting one statute of limitations applicable to the entire class." *Id.*[6] However, in *Stafford v. International Harvester Co.,* 668 F.2d 142 (2d Cir.1981), the Second Circuit, recognizing that the federal courts are divided on this issue, *id.* at 148, approved the district court's "conclusion that the reasoning of *Arneil v. Ramsey* should be followed." *Id.* at 149. Therefore I consider myself required to apply the traditional "place of injury" test to determine where the cause of action accrued.

■ In *Sack v. Low,* 478 F.2d 360, 366 (2d Cir.1973), the court held that a cause of action for fraud under Section 10(b) of the Securities Exchange Act of 1934 arises where "its economic impact is felt, normally the plaintiff's residence." *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977). Freschi resides in California. Defendants urge that because the trustee and trust are separate entities, and because the trustee as plaintiff brings the action on behalf of the trust, the limitations period of Missouri, the trust's place of organization, controls, although that appears to be the sole significant contact with that state.

In support of their position, defendants point to *Gluck v. Amicor, Inc.,* 487 F.Supp. 608 (S.D.N.Y.1980). However, the reasoning in *Gluck* compels application of the California limitations period to this case. *Gluck* involved two Delaware corporations with their principal places of business in California. In 1970 they purchased certain securities from Ecological Science Corp. ("ECO") and subsequently sold the securities at a substantial loss. *Id.* at 610. Between 1971 and 1979 a number of private damage actions alleging violations of Section 10(b) of the Securities Exchange Act of 1934 were filed on behalf of purchasers of ECO stock. *Id.* at 611. In 1976, in connection with a merger between the two Delaware corporations and a third corporation, three litigation trusts were established in New York. *Id.* at 610. The two Delaware corporations assigned their rights and claims against ECO to the trusts. *Id.* In 1979, nonresident plaintiffs, trustees of the litigation trusts, commenced an action against ECO and others alleging fraud in the sale of securities.

Unlike Freschi, the plaintiffs in *Gluck* argued that New York and not the trustees' residence prescribed the applicable limitations period. The court disagreed, looking neither to the place of organization of the trusts nor to the trustee's residence but to the residence of the assignors, the two Delaware corporations. The court went on to find that California was their residence because it was there that the assignors had their principal places of business when they purchased the stock in question and therefore, "it was there that they sustained any economic loss and suffered any injury." *Id.* at 613. The court in *Gluck* focused on the

---

**6.** Application of the "place of injury" or plaintiff's residence test in the class action context would require a determination and application of the limitations period of each class member's residence. *State Teachers Retirement Bd. v. Fluor Corp.,* 550 F.Supp. at 288. The result would be

the application of varying periods of limitation in every 10b–5 action involving class

members from different states. Such a result is without legal precedent or rational support. In 10b–5 actions in which all elements for class certification have been met, the propriety of proceeding as a class should not and will not be removed by such a vagrant factor. *State Teachers Retirement Bd. v. Fluor Corp.,* 80 F.R.D. 142, 144–45 (S.D.N.Y.1978).

residence of the assignors because they were the parties actually involved in the sale and purchase of the securities, and they were the immediate victims of the alleged fraud.

Similarly in this case Freschi was the investor. He did more than simply administer the trust; he was trustee to a trust in his own name ("William Freschi Trust") and he dealt directly with the venture. Freschi invested in Grand Coal because he wanted the tax advantages and potential profit and he personally stands to gain or lose from the investment. Like the assignors in *Gluck*, Freschi may be the immediate victim of an alleged fraud.

Moreover, Freschi's amended complaint alleges that the corpus of the trust is located in San Francisco. In his affidavit, Freschi states that the offices of the trust are located in San Francisco and New York, and that between 1977 through 1978 he conducted the business of the trust dividing his time as trustee equally between those offices. The record shows correspondence from certain of the defendants sent to Freschi's San Francisco address. On the other hand, the record indicates that the trust had little, if any, contact with the state of Missouri other than its being organized under the laws of that state. For these and the reasons discussed above, I conclude that California is the place of injury for purposes of selecting the appropriate statute of limitations.

■ California's three-year limitations period is applicable to securities fraud cases. Cal.Civ.Proc.Code § 338(4); *United Calif. Bank v. Salik,* 481 F.2d 1012 (9th Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973). "While state law fixes the length of the limitations period, federal law determines when the period begins to run." *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977). The Second Circuit has noted that the statute of limitations begins to run "not the time at which plaintiff becomes aware of all the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent

scheme." *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975); *see Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir.1979); *Arneil v. Ramsey,* 550 F.2d at 780.

Defendants argue that summary judgment should be granted because there is no genuine issue as to whether Freschi should have discovered the allegedly fraudulent activities of defendants at an early stage in the Grand Coal venture. For purposes of this analysis, we need only look at the period prior to July 13, 1978 since the action was commenced July 13, 1981, and if the three-year California limitations period began to run at any point after July 13, 1978 this action would be timely.

■ Whether the "possibility of fraud should have been apparent," *Klein v. Shields & Co.,* 470 F.2d 1344, 1347 (2d Cir. 1972) or whether "suspicions ... would have prompted a man of reasonable diligence to conduct further investigations," *Klein v. H.N. Whitney, Goadby & Co.,* 341 F.Supp. 699, 702 (S.D.N.Y.1971), are issues of fact. This court cannot decide as a matter of law when Freschi discovered or should have discovered defendants' allegedly fraudulent scheme.

■ Defendants contend that a duty to investigate may have arisen from the inception of Freschi's investment in Grand Coal. They point to the Offering Memorandum which mentioned the high risk involved in the investment and warned that there were no assurances as to either the amount of coal, if any, in the property or the extent to which the IRS would allow the anticipated deductions, if at all. Again, this court cannot conclude as a matter of law that Freschi should have suspected fraud because the investment was high risk and there was no certainty as to its returns.

Defendants also refer to both an Exchange Act Release No. 14273 dated December 15, 1977 in which the Securities Exchange Commission expressed its concern regarding the sale of interests in coal-related ventures and an article headlined "SEC Warns Investors They May be Cheated in

Coal Mine Ventures" that appeared in the December 16, 1977 Wall Street Journal. Defendants assert that as soon as there was any adverse information released about the venture, Freschi as an experienced investor should have been alerted to the possibility that the coal represented as being present on the property was not there. There is nothing in the record that indicates that Freschi ever saw either of these items. Even assuming, *arguendo,* that he had seen them, an issue of fact remains as to whether the writings should have put Freschi on notice or given rise to a duty to investigate, particularly in view of the pre-December 19, 1977 investigation by Freschi's agent.

For these reasons defendants' motion for summary judgment on Freschi's securities law claim is denied.

## II

Defendants argue that so much of Freschi's securities law and common law fraud claims based on alleged misrepresentations and omissions subsequent to December 29, 1977 should be dismissed pursuant to Rule 12(b)(6). On that date, Freschi signed the Grand Coal Venture Subscription Agreement. Payment was in the form of cash plus two promissory notes, also dated December 29, 1977.[7] Defendants contend that the alleged misrepresentations and omissions purportedly made after December 29, 1977 were not made "in connection with the purchase or sale of any security" as required by Section 10(b). Defendants therefore assert that Freschi's claims of fraud occurring after December 29, 1977 fail as a matter of law because they lack the requisite elements of reliance and causation.

Freschi argues that contrary to defendants' assertion that Freschi made his only investment decision in December, 1977 Freschi actually made several such decisions throughout the period of defendants' alleged misrepresentations and omissions, and that those decisions were made in reliance

on defendants' ongoing conduct. Freschi contends that the allegations in his complaint based on fraud occurring from the time of the original transaction through 1980 articulate a claim of fraudulent concealment.

■ In order to satisfy the "in connection with" requirement of Section 10(b), there must be a causal connection between a defendants' misstatements or omissions and plaintiff's purchase. *See SEC v. Texas Gulf Sulfur Co.,* 401 F.2d 833, 860 (2d Cir. 1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The phrase "in connection with" has been interpreted to mean that the "fraud practiced must have been prior to or contemporaneous with the sale of securities." *Kogan v. Nat'l Bank of North America,* 402 F.Supp. 359, 361 (E.D. N.Y.1975) (citations omitted). Therefore, there can be no causal connection where the alleged misrepresentation or omission occurred after the purchase. *See DuPont v. Wyly,* 61 F.R.D. 615, 625 (D.Del.1973).

■ The question to be resolved here is whether Freschi took action during the period of alleged fraudulent conduct by the defendants that represented new decisions to invest. *Troyer v. Karcagi,* 476 F.Supp. 1142, 1148 (S.D.N.Y.1979) (quoting *Fischer v. New York Stock Exchange,* 408 F.Supp. 745, 755 (S.D.N.Y.1976). "Mere retention" of securities during a period of an alleged violation does not satisfy the requirement that the violation be in connection with the purchase or sale of a security. *Pollak v. Eastman Dillon,* CCH Fed.Sec.L.Rep. ¶ 94,-987 at 97,412 (S.D.N.Y.1975); *In re Hoe & Co., Inc.,* CCH Fed.Sec.L.Rep. ¶ 94,553 at 95,923 (S.D.N.Y.1974). The Second Circuit has stated "[b]efore changes in the rights of a security holder can qualify as the 'purchase' of a new security under 10(b) and Rule 10b–5, there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson v. Fles-*

7. The first note in the amount of $130,000 is a recourse note with payments due on account of principal and interest in twelve monthly installments beginning January 15, 1978. The second note is a non-recourse promissory note in the amount of $390,000 and is payable in accordance with a formula based on the amount of coal actually mined from the property.

*chner,* 568 F.2d 862, 868 (2d Cir.1977), *cert. denied,* 436 U.S. 905, 913, 98 S.Ct. 2236, 2253, 56 L.Ed.2d 403, 414 (1978) (modifications affected by the adoption of a new partnership agreement did not constitute the purchase and sale of new securities); *see Rothstein v. Seidman & Seidman,* 410 F.Supp. 244, 247 (S.D.N.Y.1976) (agreements permitting loans to remain outstanding did not constitute reinvestments).

■ Freschi argues that representations by defendants, particularly those made in the August 2, 1978 and March 31, 1979 letters, concerning the substitution of coal-bearing lands for the original barren North Dakota property induced Freschi to continue making payments to the venture. Had defendants not assured him that other suitable land had been acquired (in Wyoming), Freschi claims he would have exercised his right to avoid a contract allegedly induced by fraud and would not have continued to invest in the project.

In support of his position Freschi argues that the substitution of the alternative mineral leaseholds is similar to the exchange of herd notes in *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154 (S.D.N.Y.1974). In *Ingenito* plaintiffs presumably seeking tax advantages purchased cattle from one of the defendants engaged in the business of selling and maintaining the animals. Plaintiffs entered into maintenance contracts under which the defendant was to provide complete care for the herdowner's animals. In addition, most of the plaintiffs financed the purchase price for the animals by a cash downpayment and a set of promissory notes payable to the defendant over a three-year period. Among plaintiffs' claims were allegations of securities fraud in violation of Section 10(b).

The *Ingenito* court was called upon to determine whether to dismiss plaintiffs' claims based on various transactions that occurred after the underlying purchase of securities[8] since defendants argued that the alleged post-purchase fraud was not "in connection with the purchase or sale of any security." *Id.* at 173–85. Four of those post-purchase transactions are particularly relevant here. First, certain of the plaintiffs in *Ingenito* argued that the exchange by herdowners of their original promissory notes (given in payment for their herds) for new notes containing extended payment terms and waiver and estoppel provisions constituted "new securities." The court concluded that because plaintiffs' investment was placed in "increasingly grave jeopardy" and because plaintiffs "gave something up," the exchange of notes did constitute new securities for Section 10(b) purposes. *Id.* at 1180. Second, certain of the plaintiffs argued that the substitution of the maintenance contract entered into at the time of the initial sales transaction for a modified maintenance contract providing reduced monthly charges constituted new securities. The court stated:

> [A] purchase or sale arises when the nature and terms of an investor's involvement in a business enterprise are substantially altered by the creation of new rights or obligations.

*Id.* at 1181. The exchange of maintenance contracts were found to meet this test.

Freschi takes the position that the substitution of the Wyoming property for the North Dakota property is similar to the exchange by herdowners of their original promissory notes in *Ingenito.* However, as part of the Grand Coal arrangement, the venture had the right, and perhaps the obligation as Freschi argues for purposes of his breach of contract claim (*see* Part III *infra*) to substitute properties. Paragraph six of the Grand Coal Venture Participant's Sublease reads as follows:

---

8. The moving defendants in *Ingenito* argued that, even assuming the underlying transactions between the seller and the purchasers constituted the sale of securities, plaintiffs' claims of post-transaction fraud should be dismissed since they were not "in connection with the purchase or sale of any security." The court adopted defendants' acquiescence for purposes of its discussion that the defendant-seller was selling securities in the nature of investment contracts since a long line of cases established that "purported sales of tangible property, service contracts or both, were held to be investment contracts." 376 F.Supp. at 1174 (citations omitted).

Sublessor [Ground] shall have the right to substitute other tracts of land for those leased herein. Such right shall not be exercised arbitrarily or capriciously, but rather only for cause and in good faith. Any property so substituted shall have, compared to the property for which it is substituted, at least as many recoverable tons of coal, and the coal contained therein shall be of equal if not better quality. Sublessee [Grand Coal] shall have the right to reject in good faith the property so substituted.

In the August 2, 1978 letter, Mitnick indicated that Grand Coal had received a project completion report from a Mineral Resources geologist and that the report concluded the North Dakota property was without economic potential as far as economically recoverable coal was concerned. Mitnick stated that he had made a demand on behalf of Grand Coal to Ground Production that it immediately furnish suitable subleases within the western United States. In the March 31, 1979 letter Mitnick stated that the venture had been assigned a coal lease covering lands in Wyoming as a partial replacement for the original subleased property.

Because the original agreement had some provision for substitution of lands, it is not clear how such substitution in this case significantly changed the nature of the investment as to amount to a "new investment." *Abrahamson v. Fleschner,* 568 F.2d at 868. The exchange of notes in *Ingenito* involved the introduction of *new* terms which substantially increased the investment risks of the plaintiffs. 376 F.Supp. at 1180. Applying the criteria set out by the *Ingenito* court, this court cannot say that Freschi's involvement in the venture was "substantially altered by the creation of new rights or obligations," *id.,* at 1181, during the period following Freschi's initial investment decision in which Grand Coal represented that it was seeking or had found other properties to replace the North Dakota lands. Moreover, Freschi has not suggested that

the Wyoming property itself posed a more acute investment risk than did the North Dakota lands.

Nor can Freschi claim that he made several investment decisions throughout the life of his payment obligation on the promissory notes. The court in *Ingenito* also considered whether periodic payments on maintenance contracts and promissory notes constituted the sale of new securities for purposes of Section 10(b). As to the payments on the maintenance contracts, the court reasoned that because those contracts were cancellable, and consequently, that each month brought on an additional "agreement to pay", each payment involved an "additional investment in the investment contract." *Id.* at 1184. As such they constituted sales of new securities. However, and most critical to the instant case, the court held that promissory note payments were not sales of new securities. The court said:

> [t]he interest was purchased at the time of the initial sale and the rights and obligations of the parties were fixed at the time of the making of the note. Each payment represented not the creation or assumption of new obligations, but the fulfillment of those previously created. There is a substantial economic and legal difference between the note payments and the maintenance payments. Each payment on a maintenance contract represented a fresh decision to further invest in Black Watch; the herdowner "bought" something each month which he did not own before which, by virtue of the cancellation clause, he was not obligated to buy. The same is not true of the note payments.

*Id.* Similarly, Freschi's obligation to pay on account of the non-cancellable recourse note was fixed as of December 29, 1977. Subsequent payments on that note did not represent new investment decisions; rather, they represented the "fulfillment" of obligations "previously created." [9]

---

9. In his memorandum of law, Freschi appears to argue that in reliance on defendants' alleged

misrepresentations and omissions, he forewent his right to avoid a contract induced by fraud.

For Section 10(b) purposes the only investment decision made by Freschi occurred on December 29, 1977. Hence, defendants are correct in their assertion that Freschi can only recover for conduct committed before that date; subsequent conduct would lack the requisite "in connection with the sale or purchase of any security." Nevertheless, although defendants can only be liable to Freschi for fraudulent conduct which preceded his investment decision, later acts by defendants may aid in establishing liability for that period:

> The defendants' practices after the plaintiff's purchase may well cast some light on the legality of earlier practices, especially if, as plaintiff alleges, the defendants have engaged in a continuous course of conduct from [the date of the purchase] to the present.

*DuPont v. Wyly,* 61 F.R.D. 615 (D.Del.1973). Accordingly, I decline to strike those portions of Freschi's securities law claim (Count I) that allege misconduct subsequent to his initial investment. *See id.*

As to Freschi's common law fraud claim a different result is mandated. As indicated above, Freschi argues that the allegations in his complaint based on fraud occurring from the time of the original transaction through 1980 articulate a claim of fraudulent concealment. Unlike the Section 10(b) claim, the common law claim is not limited by the requirement that the misrepresentations and omissions be "in connection with the sale or purchase of a security."

Under New York law, the elements of fraud are misrepresentation, knowledge of falsity, intent to deceive, reliance and injury. *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Ochs v. Woods,* 221 N.Y. 335, 338, 117 N.E. 305 (1917); *Chase Manhattan, N.A. v. Perla,* 65 A.D.2d 207, 411 N.Y.S.2d 66 (4th Dept.1978). It is evident from the face of his amended complaint that Freschi has stated a claim for ongoing concealment and misrepresentation upon which relief may be granted. Thus defendants' Rule 12(b)(6) motion is denied as to the common law claim.

### III

Finally, defendants have moved for summary judgment on Freschi's breach of contract claim asserting that there are no genuine issues of material fact as to the existence of certain obligations owed to Freschi by defendants. Specifically, defendants argue there was no contract to provide Freschi with 30,000,000 tons of economically recoverable coal or to substitute land until coal-bearing property containing the warranted quantities were obtained.

According to Freschi, the Spruce Productions offering, the documents contained in the Grand Coal offering and subsequent communications between defendants and Freschi created the contractual obligations at issue. Defendants on the other hand submit that the Grand Coal offering documents alone do not give rise to the alleged obligations and that the Spruce Productions documents and the subsequent communications do not bear on the contract issue. At this time the court will not evaluate the strength or weakness of the parties' positions. However, construing the evidence in the light most favorable to the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), I conclude that there are genuine issues of fact as to the nature of defendants' contractual obligations.

Defendants first offered Freschi an investment in Spruce Productions in December, 1977. In connection with that offering was a mining lease that *warranted* certain amounts of economically recoverable coal reserves.[10] Just before Freschi was about

---

The exercise of the right to seek rescission, however, cannot be deemed an "investment decision." *See Ingenito,* 376 F.Supp. at 1176; *Schuller v. The Slick Corporation,* [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,065 at p. 97,739 (S.D.N.Y.1975).

10. Paragraph 6(d) of the Mining Lease in the Spruce Productions offering warranted that 72,000 net tons of economically recoverable coal were contained within the leasehold premises and that if the reserves were determined to be in an amount less than 72,000 tons Spruce

to invest, Werner informed him that the offering had been withdrawn. Freschi asserts that Werner told him the new offering of Grand Coal would be virtually identical to Spruce Productions and that he could rely on the information within the Spruce Productions materials in considering whether to invest in Grand Coal.

Freschi claims he received the Grand Coal documents in March, 1978 after he had paid the initial investment price of $130,000. Although Freschi and defendants agree that the documents should be read as a "harmonious whole", they disagree as to the meaning. Freschi construes the documents as giving rise to a warranty flowing through Ground to Grand Coal and ultimately to the investors that the leaseholds supplied to the investors would include certain amounts of economically recoverable coal.[11]

Lastly, the August 22, 1978 and March 31, 1979 letters from Werner concerning the substitution of lands are alleged to modify the earlier written contract and to affirm a previous commitment by defendants to substitute property containing coal reserves. Freschi has demonstrated a sufficient factual dispute to require the denial of defendants' motion for summary judgment.

Defendants' motion to dismiss Freschi's first claim will be denied except that the claim will be limited as set forth above, although the allegations concerning the post-December 1977 transactions will not be stricken. The defendants' motion with respect to the second and third claims will be denied. Discovery will be completed by December 20, 1982, and the pretrial order will be filed on January 4, 1983.

IT IS SO ORDERED.

---

Productions would provide the lessee with additional property containing economically recoverable coal.

11. Paragraph 6(d) of the Mining Lease in the Grand Coal documents warranted that 30,000,000 net tons of economically recoverable coal were contained within the leasehold premises. The lease also provides that in the event that less than 30,000,000 tons were on the property, lessor "may" provide additional properties with an equal amount of coal. Defendants concede that this provides a monetary sanction in that

lessor must pay cash in the equivalent amount if the warranty is not fulfilled. Tri-Star Corp. and Ground were lessor and lessee respectively. There may be merit to defendants' claim that the language difference in the above lease and in Participant's Sublease is of some significance. However, Ground appears to have been set up solely for the benefit of the Grand Coal venture. Defendants have not suggested a principled basis for viewing the warranty as extending no further than Ground.