**John B. FAWCETT, Respondent,**

v.

**Robert H. HEIMBACH, Appellant.**

C7-98-1732

Court of Appeals of Minnesota.

April 20, 1999.

---

2. *Andrade v. Ellefson*, 375 N.W.2d 828, 833    (Minn.App.1985).

Charles B. Bateman, Halverson, Watters, Downs, Reyelts & Bateman, Ltd., Duluth, MN (for respondent)

John D. Kelly, Mark D. Pilon, Hanft, Fride, O'Brien, Harries, Swelbar & Burns, P.A., Duluth, MN (for appellant)

Considered and decided by PETERSON, Presiding Judge, HALBROOKS, Judge, and HUSPENI, Judge.*

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const.

## OPINION

HALBROOKS, Judge.

Appellant Robert Heimbach appeals the trial court's determination of damages and award of attorney fees in this conversion of securities case. He contends the trial court erred in fixing damages for the conversion of the securities at the time the conversion occurred rather than within a reasonable time after respondent John Fawcett discovered the conversion of the securities and erred in awarding attorney fees under the Minnesota Securities Act, Minn.Stat. ch. 80A (1998). We affirm the trial court's determination of damages and reverse the award of attorney fees.

## FACTS

In the summer of 1980, Heimbach had the opportunity to purchase shares of common stock in Medical Graphics Corporation (MGC). The stock was "legend stock," and it could not be sold, traded or pledged for a period of two years. The minimum block of shares that could be purchased was 8,000.

Heimbach was not financially able to purchase the minimum increment and asked Fawcett to join him in the purchase of the stock. Heimbach and Fawcett agreed they would contribute equally to the purchase of 8,000 shares at $1.90 per share. Their agreement was memorialized in a document entitled "Letter of Understanding," dated August 21, 1980. The agreement provided Heimbach and Fawcett would hold equal and undivided interests in the shares and the shares would be sold only by agreement of both parties with the proceeds divided equally. Pursuant to the parties' agreement, a certificate for 8,000 shares was purchased and held in Heimbach's name for the benefit of both parties.

On March 4, 1983, Heimbach sold 1,500 shares of the MGC stock at a price of $11.75 per share and received $17,623.50. Heimbach did not request Fawcett's permission to sell the shares. He also failed to disclose the sale to Fawcett and did not divide the proceeds.

On April 23, 1983, Heimbach sold 1,000 shares of stock at a price of $11.00 per share. The sale was again made without permission from or disclosure to Fawcett. The proceeds of the sale were not divided.

In the summer of 1983, Fawcett wanted to sell some shares and approached Heimbach. Heimbach agreed, and a formal addendum was written for the contract. During the conversations leading up to this sale, Fawcett also gave permission to Heimbach to sell 1,000 shares for his own benefit. This effectively ratified the sale of shares Heimbach made in April 1983, but Heimbach did not disclose the earlier sale to Fawcett in the course of the transaction.

On September 15, 1983, Heimbach again sold shares without telling Fawcett and without sharing the proceeds of the sale. Heimbach sold 500 shares of the stock at $12.00 per share, receiving a total of $5,839.88.

Sometime prior to January 1985, Heimbach deposited the remaining 4,000 shares of the stock he and Fawcett had purchased in a margin account in his own name. He also pledged the shares of stock as security and, through the margin account, borrowed funds against those shares. Heimbach did not advise Fawcett of these actions.

Heimbach initially borrowed $3,443 against the shares. In April 1985, he used the shares as security to borrow an additional $2,214.42. On May 16, 1986, Heimbach borrowed $9,632.90. On August 6, 1986, Heimbach borrowed $8,751.75. On August 28, 1986, Heimbach borrowed $5,202.

Although previous borrowings had been used to purchase stock that remained in the margin account, the August borrowing resulted in a check payable to Heimbach or to his order. This money was not divided with Fawcett.

In October 1986, Heimbach borrowed $7,001.75, which he used to purchase MGC stock. This stock remained in the margin account. By January 1987, the value of the stock reached $14.50 per share. In February 1987, Heimbach increased the debt against the stock by more than $25,000. The

art. VI, § 10.

indebtedness of the margin account exceeded the value of the shares. On November 5, 1986, the shares of stock were sold as part of a margin call. Heimbach subsequently was required to pay in $16,000 to balance the account. During the entire sequence of events, Heimbach never advised Fawcett that he had deposited the shares in a margin account or that the shares had been sold.

Between 1980, when the MGC stock was purchased, and 1994, the parties spoke two to four times per year regarding the stock. On occasion, when the value of the stock was high, Fawcett questioned whether they ought to sell their remaining shares of stock. Heimbach did not disclose that the original shares had been sold or lost; instead, he made statements to lead Fawcett to believe the stock was still held pursuant to their agreement and that holding the stock was a wise investment.

On March 11, 1994, Fawcett asked Heimbach to arrange to have Fawcett's shares of MGC stock placed in his name. Although the shares had been lost due to the margin call, Heimbach initially told Fawcett the shares were encumbered in a margin account. He did not admit his actions until Fawcett demanded he "come clean." Heimbach simultaneously purchased 3,000 shares of the stock at the then-current market price of $6.75 per share and gave Fawcett a certificate for 3,000 shares of MGC stock on May 13, 1994.

On September 11, 1996, Fawcett filed an action for conversion, fraud, breach of contract, and breach of fiduciary duty against Heimbach. The case was tried to the court.

The court found Heimbach converted Fawcett's shares on three occasions. It concluded the damages for each instance of conversion would be the value of the stock at the time of the conversion. The court also held Heimbach violated Minn.Stat. § 80A.01 and Fawcett was entitled to recover attorney fees under Minn.Stat. § 80A.23, subd. 2.

On appeal, Heimbach contends the court erred by (1) fixing damages for conversion of stock at the time of conversion rather than the time Fawcett became aware of the conversion and (2) awarding attorney fees to Fawcett under the Minnesota Securities Act.

## ISSUES

1. Did the trial court err in determining damages for the conversion of the stock at the time the stock was converted rather than within a reasonable time after Fawcett discovered the stock had been converted?

2. Did the trial court err in applying the Minnesota Securities Act to this case and awarding Fawcett attorney's fees under the act?

## ANALYSIS

### 1. Determination of damages

■ Heimbach contends the trial court erred as a matter of law in its determination of damages for the conversion of the MGC stock. Heimbach argues Minnesota has adopted the New York rule for determining the damages in cases involving the conversion of securities, and that rule states the recoverable damages for commodities of fluctuating value is the highest replacement value of the converted shares within a reasonable period of time following the discovery of the conversion. *Hornblower & Weeks–Hemphill Noyes v. Lazere*, 301 Minn. 462, 222 N.W.2d 799 (1974).

The trial court agreed that Minnesota has adopted the New York rule, but found the *Hornblower* case did not fully explain the New York rule. The trial court held the New York rule gives the injured party the option of claiming: (1) the market value at the time of conversion to afford him the basic remedy in a falling market; or (2) the highest replacement value between the discovery of the conversion and a reasonable period for replacement, when the basic measure of damages for conversion does not provide fair compensation.

■■ Our resolution of this issue requires an examination of the history and reasoning behind the New York rule. Conversion is an act of willful interference with the personal property of another that is without justification or that is inconsistent with the rights of the person entitled to the use, possession, or

ownership of the property. *Dain Bosworth, Inc. v. Goetze*, 374 N.W.2d 467, 471 (Minn. App.1985). The general measure of damages for wrongful conversion of property is the market value of the property at the time of conversion. *Gallagher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 337, 32 L.Ed. 658 (1889) (stating ordinarily goods have a fixed or relatively stable market value at which they can be replaced, so the measure of damages when they are converted is their value at the time of conversion); *McKinley v. Flaherty*, 390 N.W.2d 30, 33 (Minn.App.1986).

However, when converted goods have a fluctuating value, such as stock, courts have supplemented the general rule to provide a more equitable remedy to the injured party. C.B. Higgins, Annotation, *Measure of Damages for Conversion of Corporate Stock or Certificate*, 31 A.L.R.3d 1286, 1305, 1314–32 (1970). In *Gallagher*, the United States Supreme Court annunciated the rule to be applied in calculating damages when stock is converted. It stated the measure of damages is

> the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated.

*Gallagher*, 129 U.S. at 200, 9 S.Ct. at 337. The Court explained that when dealing with goods whose market value is volatile, allowing the injured party only the value of the stock at the time of conversion would provide an inadequate and unjust remedy, because "[t]he real injury sustained by the principal consists * * * in the sale of [the stock] at an unfavorable time, and for an unfavorable price." *Id.*

In selecting an appropriate measure for damages, the court rejected the "English" rule, which permitted the plaintiff the highest value of the stock between the time of conversion and the time of trial. *Id.* at 201, 9 S.Ct. at 337. Instead, it used the New York modification of the rule. *Id.* at 202, 9 S.Ct. at 338; *see also Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 140 (2d

Cir.1983) (discussing *Gallagher*). This rule awarded the plaintiff

> the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock.

*Gallagher*, 129 U.S. at 202, 9 S.Ct. at 337.

■ The Second Circuit Court of Appeals has refined the New York rule as set forth in *Gallagher* in order to prevent inappropriate windfalls to plaintiffs which may occur when wrongfully converted stock reaches a higher price in the period between its conversion and the notice of conversion than in the period between notice of conversion and a reasonable time after notice. *Schultz*, 716 F.2d at 140; *Commonwealth Assocs. v. Palomar Med. Technologies*, 982 F.Supp. 205, 210 (S.D.N.Y.1997). In these cases, the injured party should not receive the windfall of the higher price reached during the period before he receives notice of the conversion because "if he had desired to dispose of [his property] in that interval, he would have learned of the conversion." *Schultz*, 716 F.2d at 141 (quoting *In re Salmon Weed & Co.*, 53 F.2d 335, 341 (2d Cir.1931)). Thus, the measure of damages for wrongful conversion under the New York rule is either

> (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher.

*Id.*; *Commonwealth Assocs.*, 982 F.Supp. at 210.

The Eighth Circuit Court of Appeals has also recognized the two-prong measure of damages in the New York rule. *Myzel v. Fields*, 386 F.2d 718, 746 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). In considering a Minnesota case arising out of the sale of stock of a closed corporation, the court noted:

> The federal courts have historically approved a rule of damages for conversion of stock measured by the price at the time of conversion or the highest intermediate value reached within a reasonable time after

notice of the conversion by the plaintiff, whichever is greater.

*Id.*

Similarly, C.B. Higgins states in his annotation,

Where the value of converted stock has gone down, most courts would agree that the measure of damages is the value at the time of conversion. But if the value has gone up courts and legislatures have developed a variety of rules.

Higgins, *supra* at 1290. In discussing the time for fixing damages under the New York rule, Higgins states the New York rule

provides for valuation at the highest market price of the stock between the time the customer has notice of the sale * * * and a reasonable time thereafter within which to decide whether or not to go into the market and replace the stock. The rule also gives him the option of claiming the market value at the time of conversion to afford him the basic remedy in a falling market.

*Id.* at 1323.

Heimbach cites *Hornblower* for the proposition that our supreme court only adopted the portion of the New York rule that determines damages for conversion of stock within a reasonable time after the owner has knowledge of the conversion. *See Hornblower*, 301 Minn. at 473, 222 N.W.2d at 806. We do not believe *Hornblower* intended to limit plaintiffs to the value of the stock within a reasonable time after notice of the conversion.

In *Hornblower*, the court considered whether damages should be assessed at: (1) the highest market value the stock achieves between the date of conversion and the date of its return, or (2) the highest market value the stock reaches within a reasonable time after the owner of the stock has knowledge of the conversion. *Hornblower*, 301 Minn. at 473, 222 N.W.2d at 806. It did not address the situation where there is a falling market and the owner of the stock seeks to recover the value of the stock at the time of conversion rather than within a reasonable time after the owner had knowledge of the conversion.

■ Faced with this situation now, we conclude when the market value of the stock is lower within a reasonable time after the owner learns of the conversion than at the time of the conversion, the owner has the option of claiming the market value at the time of conversion. Thus, where there is a rising market, it is most equitable to both the perpetrator and the injured party to determine damages within a reasonable time after the injured party should have known of the conversion. But where there is a falling market, it would be inequitable to provide the injured party with less than the value of the stock at the time of the conversion. *See* Higgins, *supra*, at 1290 (stating "[w]here the value of the converted stock has gone down, most courts would agree that the measure of damages is the value at the time of conversion."); *see also In re Salmon Weed & Co.*, 53 F.2d at 341 (holding the measure of damages for the conversion of stock is its value within a reasonable time after notice of conversion "except in cases where it is less than the value at the date of conversion").

## 2. Attorney fees under Minn.Stat. § 80A.01 (1998)

■ The trial court found Heimbach's actions violated Minn.Stat. § 80A.01 and assessed attorney fees against him in accordance with Minn.Stat. § 80A.23, subd. 2 (1998). Minn.Stat. § 80A.01 states, in relevant part:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c ) to engage in any act or practice or course of business which operates or would operate as a fraud or deceit upon any person.

Minn.Stat. § 80A.23, subd. 2, allows attorney fees for violation of section 80A.01 in "con-

nection with the purchase or sale of any security." It states, in pertinent part:

> Any person who violates section 80A.01 in connection with the purchase or sale of any security shall be liable to any person damaged thereby who sold such security to that person or to whom that person sold such security, * * *. Damages in an action pursuant to this subdivision shall include * * * reasonable attorney's fees.

■ The Minnesota Securities Act is to be construed to "coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation." Minn.Stat. § 80A.31 (1998). Federal caselaw is of considerable precedential value in deciding issues arising under the act. *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 534 (Minn.1986). The federal corollary to Minn.Stat. § 80A. 01 is section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) (1994). The Securities Exchange Commission prescribed rule 10b–5[1] to enforce the provisions of section 10(b). *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1048 (8th Cir. 1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).

To bring a claim pursuant to rule 10b–5, a plaintiff must establish:

> 1) that the defendant acted in a manner prohibited by the Rule, whether it be that the defendant employed a device, scheme, or artifice to defraud, made misrepresentations or omissions of material fact, or engaged in acts, practices, or courses of business that operate as a fraud or deceit; 2) causation, often analyzed in terms of materiality and reliance; 3) damages; and 4) that the fraudulent activity occurred in connection with the purchase and sale of a security. A finding of scienter, that is, an "intent to deceive, manipulate, or defraud,"

is also a prerequisite to recovery under section 10(b) and Rule 10b–5.

*Harris v. Union Electric Co.*, 787 F.2d 355, 362 (8th Cir.1986) (citations omitted), *cert. denied*, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986); *see also Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1327 (8th Cir. 1991) (stating the essential elements of a rule 10b–5 claim are scienter, causation, and damages).

To satisfy the "in connection with" requirement of section 10(b) and rule 10b–5, "there must be a causal connection between a defendant's misstatements or omission and plaintiff's purchase." *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y.1982). The phrase "in connection with" has been interpreted to mean that the "fraud practiced must have been prior to or contemporaneous with the sale of the securities." *Id.* (quoting *Kogan v. Nat'l Bank of N. Am.*, 402 F.Supp. 359, 361 (E.D.N.Y.1975)). Therefore, a causal connection cannot exist where the alleged misrepresentation or omission occurred after the purchase. *First Fed. Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co.*, 629 F.Supp. 427, 439 (S.D.N.Y.1986); *Freschi*, 551 F.Supp. at 1227; *see also Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1327 (8th Cir.1991) (holding that to satisfy the causation element a plaintiff must prove the allegedly fraudulent acts caused the plaintiff to purchase the securities).

Fawcett has failed to satisfy the "in connection with" element of section 10(b) and its Minnesota corollary, section 80A.01. There is no evidence Heimbach omitted any material facts or made false representations to Fawcett about the stock when he initially asked Fawcett to join him in purchasing it. *Cf. Davis v. Midwest Discount Sec., Inc.*, 439 N.W.2d 383, 388 (Minn.App.1989) (holding "[t]o state a claim under Minn.Stat. § 80A [a party] must allege a misstatement or omis-

---

1. Rule 10b–5 provides:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact

   necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

   17 C.F.R. § 240.10b–5 (1998).

sion in connection with his own decision to purchase or sell a security."). There is also insufficient evidence to connect Heimbach's conduct two years after the purchase of the stock with Fawcett's initial decision to purchase the stock. For these reasons, we are compelled to reverse the trial court's grant of attorney fees.

## DECISION

The trial court properly determined the damages for the conversion of Fawcett's stock at the time the stock was converted rather than within a reasonable time after Fawcett discovered the stock had been converted. Because Fawcett failed to demonstrate Heimbach's fraudulent acts were prior to or contemporaneous with Fawcett's decision to purchase the stock, the trial court erred in awarding attorney fees to Fawcett under Minn.Stat. §§ 80A.01 and 80A.23.

**Affirmed in part and reversed in part.**